IN THE MATTER OF THE PETITION OF JERSEY CENTRAL POW-
ER & LIGHT COMPANY FOR AN APPROVAL OF AN AMEND-
MENT TO ITS TARIFF FOR ELECTRIC SERVICE AND FOR
AMENDMENT TO THE ENERGY ADJUSTMENT CLAUSE AND
FACTOR IN SAID TARIFF FOR SUCH SERVICE.

Argued January 12, 1981—Decided April 8, 1981.

*William F. Hyland* argued the cause for appellant Jersey Central Power & Light Company (*Riker, Danzig, Scherer & Hyland,* attorneys; *Jack B. Kirsten* and *James B. Liberman,* a member of the New York bar, of counsel; *Mr. Hyland, Mr. Kirsten* and *Mr. Liberman,* on the briefs).

*Alfred L. Nardelli,* Deputy Public Advocate, argued the cause for cross-appellant Public Advocate (*Stanley C. Van Ness,* Public Advocate, attorney; *Mr. Nardelli* and *Mr. Menasha J. Tausner,* Deputy Public Advocate, on the briefs).

*John C. Sahradnik,* Assistant County Counsel, relied on the brief and argument of the Public Advocate on behalf of the cross-appellant Board of Chosen Freeholders of the County of Ocean (*Franklin H. Berry, Jr.,* County Counsel, attorney).

*Carla Vivian Bello,* Deputy Attorney General, argued the cause for respondent Board of Public Utilities (*John J. Degnan,* Attorney General of New Jersey, attorney; *Erminie L. Conley,* Assistant Attorney General, of counsel).

*Nicholas W. Mattia, Jr.* submitted a brief on behalf of respondent New Jersey Utilities Association (*Conway, Reiseman, Bumgardner, Hurley & Kleinfeld,* attorneys; *Mr. Mattia* and *Douglas R. Kleinfeld,* on the brief).

The opinion of the Court was delivered by

SULLIVAN, J.

This litigation by Jersey Central Power & Light Co. (JCP&L) over its tariffs (rates charged its customers) stems from the nuclear mishap at Three Mile Island (TMI) in Pennsylvania. On March 28, 1979 an accident occurred in the TMI nuclear-powered electricity generating station, Unit No. 2 (TMI–2), rendering the unit inoperable. It is problematic as to when, if ever, this unit can be returned to service. The TMI station also includes another generating unit (TMI–1) which was in "cold shutdown" for refueling at the time of the accident. TMI–1, although undamaged, has remained in the shutdown state by order of the Federal Nuclear Regulatory Commission (NRC) pending completed review of the unit design, the operator's technical, financial and managerial capability, its emergency procedures and the interaction between the damaged TMI–2 and TMI–1. To date, the NRC has not authorized TMI's operators to resume the generation of electrical power from TMI–1.

The TMI facility is operated by Metropolitan Edison Company, a Pennsylvania utility which is a subsidiary of the General Public Utility System (GPU), a large publicly owned utility holding company. JCP&L, a New Jersey utility, is also a subsidiary of GPU [1] and it owns a 25% undivided interest in the two generating units at TMI. Until the accident in March 1979, JCP&L obtained substantial amounts of electricity for its customers from TMI. Following the accident, however, it became necessary for JCP&L to purchase replacement electricity from

---

[1]GPU owns all of the common stock of its subsidiaries, while the public in general holds the preferred stock, bonds and debentures.

other utilities. The estimated cost of this energy was $10 million per month. Since its filed tariff included no provisions for these additional costs, JCP&L, by petition filed on May 4, 1979, sought an adjustment in its tariff to produce additional revenues. It did not seek an increase in base rates at the time. Rather, it applied to the New Jersey Board of Public Utilities (Board) for the approval of a proposed $113 million increase in annual revenues under the Levelized Energy Adjustment Clause (LEAC) which is a part of its tariff. The LEAC is a regulatory device which is used to adjust consumer rates as a result of fluctuations in fuel costs. A constant LEAC charge is included in a utility's tariff based on estimated prospective 12-month energy costs. This charge is subject to periodic adjustment to reflect actual costs.

In view of the emergent nature of the situation, an immediate hearing was held on the JCP&L petition. On June 18, 1979 the Board allowed JCP&L to increase its LEAC factor to produce additional revenues of $74.7 million annually. At the same time, however, the Board ordered excluded from the rate base, the damaged and inoperable TMI–2, because it concluded that the unit would not be "used and useful" in providing electric generating service for a period of at least two to four years, if ever. This exclusion resulted in a reduction of JCP&L's base revenues by $29 million. The Board permitted TMI–1 to remain in the rate base on the expectation that it would be placed back in commercial operation by January 1, 1980. It also prohibited the payment of dividends by JCP&L to GPU, its parent corporation, for the remainder of 1979. As a result of the June 18, 1979 Order, JCP&L was to realize a net increase in annual revenues of approximately $45 million.

JCP&L's financial problems did not end with the approved increase in revenues. On September 5, 1979, after JCP&L petitioned for a LEAC adjustment unrelated to TMI, the Board authorized an annual increase of $70 million in the utility's LEAC charges. Still another request for a LEAC adjustment was made in a JCP&L petition filed on January 21, 1980. The

greater part of this application covered fuel increases not directly related to TMI but did include substantial TMI replacement energy costs. The Board dealt with this application in two phases. On March 6, 1980, it authorized LEAC increases of $84 million annually for the non-TMI fuel increases. As to the TMI-related replacement energy costs, however, the Board deferred action and announced its intention to reopen the question as to whether TMI–1 should remain in JCP&L's rate base.

Following extensive hearings, the Board, on April 1, 1980, entered two Orders. One Order granted JCP&L an increase of $34.4 million in LEAC revenues to cover TMI replacement energy costs. The second removed TMI–1 from JCP&L's rate base on the ground that the unit had been out of service for more than a year and would remain so for at least another year. Because of the uncertainty as to the future availability of TMI–1, the Board found that the unit was no longer "used and useful" in supplying energy and that JCP&L should not be permitted to earn a return thereon.[2] The Board pointed out that unless it did so, ratepayers would be paying for both the capital and operating expenses of TMI–1 as well as the replacement energy costs associated with the unit.

In the second Order the Board also noted that the removal of TMI–1 from the rate base would reduce JCP&L's base rate revenues by $17.9 million and aggravate the company's serious financial condition. It recognized that, because of this condition, JCP&L would for some time be unable to have access to traditional sources of capital and would be hard pressed to maintain a construction program required to provide safe, adequate and proper service. The Board, therefore, decided to address JCP&L's cash flow problem directly and included in its second Order a provision that recovery of JCP&L's deferred

---

[2]The Board also noted that if and when TMI–1 is returned to service, it will expeditiously be put back into the rate base.

energy account[3] be accelerated in an amount equivalent to offset the $17.9 million loss in base rate revenues. This resulted in JCP&L's rates being maintained at existing levels.

Finally, the Board noted that while JCP&L had not yet filed a petition for an increase in its base rate, when it did so, the Board would consider "the just and reasonable aspects of the utility's existing rate structure vis-a-vis its rate base, operating income and expenses." We are advised that immediately following the April 1, 1980 Orders, such a petition was filed and on May 13, 1980 JCP&L was granted an interim provisional base rate increase of $60 million annually. The hearing on that petition is now in progress.

JCP&L filed a notice of appeal from that part of the April 1, 1980 Order which removed TMI–1 from its rate base. The Public Advocate then filed a notice of cross-appeal from that portion of the Order which authorized the accelerated amortization of the deferred energy account. The Board of Chosen Freeholders of Ocean County also filed a cross-appeal from the authorization of accelerated amortization of the deferred energy account.[4] This Court granted direct certification while the matter was pending unheard in the Appellate Division. 85 N.J. 463 (1980).

Before considering each of the claims presented, we note the limits of our review of the Board's actions. In *Public Service Coordinated Transport v. State*, 5 *N.J.* 196 (1950), this Court observed that "rate making is a legislative and not a

---

[3]JCP&L's deferred energy balance is made up of unrecovered energy costs accumulated as a result of shortfalls in prior fuel clause adjustments. The balance includes $51.4 million of deferred energy costs incurred prior to the TMI accident which were being amortized over a 22-year period.

[4]The Ocean County cross-appeal also challenged the failure of the Board to deduct from JCP&L's deferred energy account an amount equivalent to the revenues generated by the inclusion of TMI–1 and its expenses in the rate base from March 28, 1979 to April 1, 1980. Ocean County has not filed a brief on this issue and it will be treated as having been abandoned.

judicial function, and that the Board of Public Utility Commissioners, to which the Legislature has delegated its rate-making power is vested with broad discretion in the exercise of that authority." *Id.* at 214. Thus, the Board's rulings are entitled to presumptive validity and will not be disturbed unless we find a lack of "reasonable support in the evidence." *In re New Jersey Power & Light Co.*, 9 *N.J.* 498, 509 (1952).

We deal first with cross-appellants' contentions that the Board erred in accelerating the amortization of JCP&L's deferred energy balance so as to produce $17.9 million of additional annual revenues. As stated by the Board, the reason for this acceleration was to offset the $17.9 million loss in base rate revenues caused by the removal of TMI–1 from the rate base. It is argued that (1) there was no evidence showing how or why the resulting increase in revenues was appropriate, and (2) no notice and opportunity to be heard on the issue was provided.

█ Neither contention has merit. With regard to the first, we initially note that the Board's action did not result in an overall increase in JCP&L's annual revenues and it did not constitute the granting of a rate increase. The acceleration was intended to offset, exactly, the loss in base rate revenues caused by the removal of TMI–1 from the rate base. This decision was not arrived at in a "factual vacuum" as is urged by the Public Advocate. The Board's detailed decision evidences its recognition of JCP&L's financial plight and the Board's concern about the utility's possible insolvency and bankruptcy. The Board was faced with an unprecedented problem of immediate urgency. JCP&L's solvency, indeed, its very existence was at stake. The utility's ability to provide continued safe, adequate and proper service pursuant to *N.J.S.A* 48:2–23 was in doubt. The Board recognized the need to balance the burden placed on JCP&L's ratepayers against the continued maintenance of JCP&L as an ongoing utility serving the public. Having concluded that TMI–1 must be removed from JCP&L's rate base with the consequent loss in base rate revenues of $17.9 million (an issue

to be discussed hereinafter), the Board devised a carefully tailored plan, one object of which was to maintain the utility's cash flow despite the removal of TMI–1 from the rate base.

In support of their second argument, cross-appellants assert that the Board's failure to give sufficient notice of its proposed action denied the parties the opportunity to introduce testimony on the issue and to cross-examine the other parties' witnesses. Their contention is based on procedural due process considerations and upon the Administrative Procedure Act (APA) which provides for a hearing, after reasonable notice, to all parties involved in "contested cases" decided by an administrative agency. *N.J.S.A.* 52:14B–9(a); 52:14B–2(b). We conclude that neither procedural due process nor the APA required the Board to provide particularized notice of its specific intention to make a policy determination with respect to accelerated amortization of the deferred energy balance. In the total circumstances of this case the basis for the Board's determination is obvious. The resolution of this unique policy question would not have been aided by the furnishing of a more explicit notice on this matter. Moreover, the facts on which the Board based its decision were undisputed. Cross-appellants have not demonstrated prejudice and do not make any proffer of noteworthy evidence that would have been introduced had they received more detailed notice of the Board's proposed action. In view of the unique circumstances surrounding the Board's decision on this issue, including JCP&L's precarious financial situation and the fact that the Board's decision did not result in a rate increase, we find that the Board was acting within its discretionary power when it ordered the accelerated amortization of the deferred energy balance. *Public Service Coordinated Transport,* 5 *N.J.* at 214.

The rates which a public utility charges its customers are regulated by the Board of Public Utilities. *N.J.S.A.* 48:2–21(b)

provides that the utility rates fixed by the Board of Public Utilities shall be "just and reasonable." A rate hearing involves (a) the determination of the value of utility property (rate base), (b) an examination of utility expenses, and (c) the fixing of a fair rate of return to investors. See *Public Service Coordinated Transport*, 5 *N.J.* at 216. The end result is the base rate which the utility may charge its customers. In determining what property goes into the rate base this Court has approved the "used and useful" standard first articulated by our former Supreme Court in *Atlantic City &c. Co. v. Bd. of Pub. Utility Commrs.*, 128 *N.J.L.* 359, 365 (S.Ct.1942), aff'd o.b., 129 *N.J.L.* 401 (E. & A. 1943). In *Public Service Coordinated Transport v. State*, Chief Justice Vanderbilt, after stating that the determination of rate base was fundamental in any rate proceeding, defined rate base as "the fair value of the property of the public utility that is used and useful in the public service." 5 *N.J.* at 217. We have recently reaffirmed this concept in *In re Intrastate Industrial Sand Rates*, 66 *N.J.* 12, 22 (1974).

JCP&L does not question the validity of this rate-making method. It concedes that under existing law, both federal and state, use of a rate base may be largely limited to property which is currently used to render utility service. It objects, however, to what it considers a mechanistic application of the "used and useful" standard without due consideration of the consequences and a proper balancing of consumer and investor interests. In this regard, JCP&L contends that the Board failed to determine what impact its order had on JCP&L's financial integrity or its ability to attract necessary capital and fairly compensate investors for the risks they have assumed. In short, JCP&L contends that the statutory requirement that the Board fix just and reasonable rates necessarily includes due consideration by the Board of all of these elements. It is also contended that TMI–1 should not have been taken out of the rate base since it is not obsolete, it has the capacity to produce electricity

and, when the NRC grants permission to resume operations, it will be essentially the same facility as it was prior to March 28, 1979.

■ We address first, the Board's determination that TMI–1 was not "used and useful" within the meaning of *Public Service Transport.* In reaching its decision, the Board estimated that TMI–1 would be out of service for a total of at least two years, an estimate that seems conservative at the present time. Its decision noted that the uncertainty associated with the future availability of TMI–1 has increased and that the ongoing proceedings before the NRC are comprehensive and incorporate complex considerations; some of which have never before been litigated. One issue raised by the NRC involves the financial and technical ability of the operator of TMI "to safely operate" the facility. The Board also referred to necessary modifications of TMI–1 which will have to be made and which will be subject to NRC approval. In view of these factors, the Board felt compelled to find that TMI–1 "is not at the present time used and useful in the public service." The record fully supports this determination.

■ We now consider whether the Board, based on the foregoing determination, had the authority to remove TMI–1 from the rate base and, if so, whether it gave due regard to all relevant factors before reaching its decision. We conclude that the Board had such authority and, in the circumstances presented, exercised its power after giving full attention to all relevant factors. See *In re New Jersey Power & Light Co.*, 9 *N.J.* at 522–524.

■ The proceeding on appeal was not a rate hearing in which the utility was asking for an increase in its rate base or its rate of return. In its petitions to the Board following the accident at TMI, JCP&L was only seeking LEAC adjustments to compen-

sate it for the added cost of purchasing electricity needed to replace that lost by the shutdown of TMI. The Board, when it granted the first of the LEAC increases, was aware that at the same time the utility was also earning a return on its investment in TMI–1, even though the unit was not producing electricity. Despite this somewhat paradoxical situation, the Board did not apply the used and useful standard mechanically and order that TMI–1 be removed from the JCP&L's rate base. Rather, it found that the outage of this unit was expected to be of temporary duration and allowed TMI–1 to remain in the rate base. In so doing the Board recognized that the "used and useful" standard should not be applied to a situation where a unit was shut down for refueling, maintenance or repairs and was expected to be back in commercial operation within a reasonable period of time. See *Atlantic City &c. Co. v. Bd. of Pub. Utility Commrs.*, 128 *N.J.L.* at 366.

It was not until April 1, 1980, after TMI–1 had remained shut down for more than a year, that the Board concluded that its estimate of an outage of temporary duration was erroneous and that it then appeared that the shutdown would last at least two years. Finding that situation, the Board felt compelled to order the removal TMI–1 from the rate base in order to protect JCP&L's ratepayers from continuing to shoulder a double financial burden as to this substitute power for an indefinite period of time.

In reaching this decision, the Board expressly recognized the need to balance the burden on ratepayers with investor interests. It gave thoughtful consideration to JCP&L's financial problems, not all of which were due to the TMI disaster. It noted that the utility had not applied for a rate increase so that available avenues of relief were limited. Since the dire financial condition of JCP&L had closed off traditional sources of financing and the utility was facing a severe cash flow problem, the

Board addressed that problem directly. It did so by ordering the accelerated amortization of the deferred energy account in an amount equal to the revenues lost by the removal of TMI–1 from the rate base. The result was that rates charged customers would remain at the same level and JCP&L's cash flow would be unimpaired. We view the Board's action as innovative and a mutually fair interim solution to a critical problem well within the broad jurisdiction vested in the Board under the Department of Public Utilities Act. *N.J.S.A.* 48:2–1 *et seq.*; see *Atlantic City &c. Co. v. Bd. of Pub. Utility Commrs.*, 128 *N.J.L.* at 368; *Public Service Coordinated Transport*, 5 *N.J.* at 214.

Any review of JCP&L's acute financial status and the Board's concern therefore must include the fact that, shortly after the April 1, 1980 decision by the Board, JCP&L filed a petition for a rate increase and on May 13, 1980 it was granted an interim provisional base rate increase of $60 million annually. This increase of more than three times the amount lost by the removal of TMI–1 from the rate base clearly evidences the Board's continued concern for JCP&L's financial stability.

We regard the numerous issues raised by the utility in this appeal to be more properly presented in the pending rate increase proceeding. In addition to dealing with the utility's troubled financial condition and fixing just and reasonable rates, the Board in that proceeding necessarily will have to give full attention to the continued exclusion of TMI–1 from the rate base.

Affirmed.

*For affirmance*—Justices SULLIVAN, PASHMAN, CLIFFORD and HANDLER and Judges MATTHEWS, FRITZ and ALLCORN—7.

*For reversal*—none.