699 A.2d 1224

IN THE MATTER OF THE PETITION OF PUBLIC SERVICE ELEC-
TRIC AND GAS COMPANY FOR APPROVAL OF AN INCREASE
IN ELECTRIC AND GAS RATES AND FOR CHANGES IN THE
TARIFFS FOR ELECTRIC AND GAS SERVICE.

IN THE MATTER OF THE PETITION OF PUBLIC SERVICE
ELECTRIC AND GAS COMPANY TO REVISE ITS
CUSTOMER SERVICE PRICING SCHEDULE.

Superior Court of New Jersey
Appellate Division

Argued March 24, 1997—Decided June 26, 1997.

252

Before Judges LANDAU, WALLACE and KIMMELMAN.

*Peter D. Dickson* argued the cause for appellant The Coalition for Fair Competition (*Potter and Dickson*, attorneys; *Mr. Dickson* and *R. William Potter*, on the brief).

*John A. Hoffman* argued the cause for respondent Public Service Electric and Gas Company (*Wilentz, Goldman & Spitzer*, attorneys; *Francis E. Delany, Jr.*, and *Richard Fryling*, Corpo-

rate Rate Counsel; *Mr. Hoffman, Christine D. Petruzzell* and *Hesser G. McBride, Jr.*, on the brief).

*Helene S. Wallenstein*, Senior Deputy Attorney General, argued the cause for New Jersey Board of Public Utilities (*Peter Verniero*, Attorney General, attorney; *Andrea M. Silkowitz*, Assistant Attorney General, of counsel; *Ms. Wallenstein*, on the brief).

The opinion of the Court was delivered by

WALLACE, JR., J.A.D.

This is a public utility rate case. The Coalition for Fair Competition and Daniel Chinitz (Coalition) appeal from a series of orders spanning December 1992 to May 1994 by the Board of Regulatory Commissioners (Board) granting rate petitions to Public Service Electric & Gas (PSE & G). The orders disposed of two consolidated rate petitions. One rate petition sought an increase in base rates for gas and electric services. The other petition sought an increase in charges for installing gas appliance parts and performing repair services. In this appeal, the Coalition challenges (1) the propriety of the Board's decision-making technique of adopting three comprehensive settlement agreements in place of its own independent analysis and findings of fact, and (2) the sufficiency of the evidence supporting the Board's ruling on the APSO petition. We affirm.

I

On October 1, 1991, PSE & G petitioned the Board for approval to increase its charges for the delivery and installation of gas appliance replacement parts and other related services. This petition was referred to as the Appliance Parts and Service Order (APSO) petition. PSE & G sought an average increase of 13.6% per appliance part and service order from the rates that had been implemented on August 8, 1990. On November 14, 1991, PSE & G petitioned the Board for an increase in its base rates for gas and electric services (Base Rate) in the total amount of 688.7 million. The two petitions were subsequently consolidated and transmitted

to the Office of Administrative Law for hearing as a contested case.

In February 1992 the Coalition moved to intervene. The Coalition identified itself as a trade association with members in the heating, cooling, and appliance service business. It alleged that it would be injured if PSE & G were permitted to raise its base rates and to provide APSO services below cost to the detriment of the Coalition members. At the hearing on its motion to intervene on May 5, 1992, the Coalition noted that it wanted to appear solely with respect to the points raised in its motion and did not contemplate that its intervention would cause undue delay.

Daniel Chinitz, owner of a plumbing supply company joined in the motion to intervene. He claimed that he would be harmed if PSE & G's requests were granted. Rate Counsel [1] supported the Coalition's motion to intervene. The Administrative Law Judge (ALJ) granted the motion and scheduled the end of August 1992 for consideration of the APSO case.

Fifty-nine days of evidentiary hearings were conducted before the ALJ between April 27, 1992 and August 27, 1992, generating over 12,000 pages of transcript and over 900 exhibits. The Coalition participated only on the two dates scheduled for the APSO portion of the hearings, August 24 and 25.

After closing the record on August 27, 1992, the ALJ established a briefing schedule and a schedule of settlement negotiations addressed to the Base Rate issues. The Coalition did not join in those negotiations.

The settlement negotiations resulted in three settlement agreements, referred to jointly as the "Stipulations," which purported to settle the issues involved in the Base Rate case. The first agreement was captioned the Revenue Requirement Stipulation.

---

[1] Until it was eliminated on July 1, 1994, the Division of Rate Counsel was the body within the Department of the Public Advocate charged with representing the interests of the public in rate proceedings. *N.J.S.A.* 52:27E–18 (repealed by *L.*1994, *c.* 58 § 70).

The parties executing this Stipulation were PSE & G, the Board Staff, Rate Counsel and one of the intervenors, Federal Executive Agencies. PSE & G had originally sought a $476.3 million increase in electric base revenues and a $145.5 million increase in gas base revenues. The signatories agreed to "an increase in electric base revenues of $235 million and an increase in gas base revenues of $35 million" and to a rate of return of 10.08% on both electric and gas. The Stipulation explained in detail how these figures were computed and expressed that the record and exhibits in evidence provided ample support for the Stipulation. Further the parties agreed that the Stipulation "represents a fair and reasonable overall disposition of this proceeding which protects and promotes the interests of the electric and gas customers and affords a reasonable level of rate relief which will enable [PSE & G] to continue to render safe, adequate and proper electric and gas service to the public." The parties also agreed that the Stipulations were intended to be a "full, final and complete resolution of the issues contained therein."

The second Stipulation was captioned the Electric Cost-of-Service/Rate Design Stipulation. This Stipulation was executed by the four signatories to the Revenue Requirement Stipulation, plus four other intervenors: New Jersey Food Council, Princeton University, New Jersey Industrial Energy Users, and Millen Industries, Inc. This Stipulation allocated the $235 million increase in electric base revenues among eleven listed "classes" of services and detailed charges for various services.

The third Stipulation was the Gas Cost-of-Service/Rate Design Stipulation. This Stipulation was signed by PSE & G, the Board Staff, Rate Counsel, and five intervenors: the Township of South Orange Village, the Township of Glen Ridge, the Montclair Cogeneration Project Associates Limited Partnership, New Jersey Industrial Energy Users, and North Atlantic Utilities. This Stipulation allocated the gas base-rate increase among four kinds of services: residential, general, large volume, and street lighting. It also detailed charges for various services.

After reviewing the history of the hearings and subsequent negotiations, the ALJ, in his initial decision dated December 14, 1992, noted that "all active parties" had submitted three Stipulations to settle all outstanding issues in the Base Rate case and that the APSO issues would be decided later. The ALJ stated:

After careful review, I FIND that the stipulations represent a fair and reasonable overall disposition of these proceedings which protects and promotes the interests of the electric and gas customers and affords a reasonable level of rate relief which will enable the Petitioner to continue to render safe, adequate and proper electric and gas service to the public, and is therefore in the public interest. The Stipulation[s] are attached hereto, and fully incorporated herein. I note that all active parties to these proceedings have executed these stipulation[s] of settlements.

The Coalition filed exceptions to the ALJ's decision. It asserted that PSE & G had sought successfully to remove the Coalition from the roster of parties during the negotiations over the Stipulations. The Coalition complained that it was denied the opportunity to engage in "horse trading," which it asserted was the essence of negotiation. It rejected the ALJ's premise that the issues of interest to them involving competition for appliance repairs could be resolved separately in the pending hearings in the APSO part of the case. It also insisted that the Stipulations in the Base Rate case had an "impact" on the APSO issues, and that, therefore, the Stipulations could not be accepted without the agreement of the Coalition. The Coalition urged the Board to conclude that there was no settlement to approve and to remand the matter to reopen the proceeding and to include the Coalition within the negotiation process.

At the Board's December 30, 1992 meeting, the Coalition began to argue in support of its exceptions. The Board's chairman interrupted and stated that the "proper place" for the Coalition's arguments was in the pending APSO proceeding. The chairman added that the Coalition could have attended but did not attend the numerous meetings at which the Stipulations were negotiated. Thereafter, the Board members voted to accept the Stipulations.

The Board issued its Summary Decision and Order the next day, concluding:

> The Board *FINDS* these Stipulations represent a reasonable disposition of the issues in these matters which will enable the Company to continue to provide its customers with safe, adequate and proper service at just and reasonable rates, and that the Stipulations appropriately balance the interest of the utility's ratepayers and shareholders, and therefore, are in the public interest. Accordingly, the Board *HEREBY ADOPTS* the Initial Decision of ALJ McAfoos and the three Stipulations as its own and incorporates the Initial Decision and Stipulations into the within Order as if fully set forth herein....

The Board added that it was issuing a decision on a "summary" basis in order to implement the new rates by January 1, 1993, the date contemplated by the Stipulations and that a final decision would follow.

The Board considered the Coalition's concerns but agreed with the ALJ that those concerns could be addressed in the APSO case, concluding that:

> In order to preserve the ability to implement any findings which may be made in support of any of these issues, the Board *HEREBY ORDERS* that the rates and other provisions established pursuant to the within Decision and Order shall be subject to modification, effective January 1, 1993, to reflect any findings which may ultimately be made regarding the Coalition's outstanding issues.

In its May 14, 1993 Final Decision and Order, the Board reviewed each Stipulation in detail and reiterated its decision to adopt the Stipulations subject to any modifications necessitated by the pending APSO case. The Board addressed the Coalition's challenges to its mode of decision and rejected the Coalition's claim that it had been excluded from the negotiating process:

> It is clear that the Coalition had a full opportunity to participate in the litigation phase of these proceedings, consistent with ALJ McAfoos' May 5, 1993 ruling. Moreover, the Coalition had a full opportunity to present to the Board its Exceptions to the Initial Decision of the ALJ. No party filed Exceptions adverse to the Coalition and thus the Coalition was not prejudiced by the Board's shortening the period for Replies to Exceptions. Additionally, the Coalition was fully aware that settlement negotiations among the parties were occurring, but did not participate in those negotiations. The Board is not aware of any overture by the Coalition or any other non-signatory party to take part in settlement negotiations which was denied. No procedural rights of the Coalition have been violated.

Next, the Board criticized the Coalition's conceded motive and emphasized that settlements were favored.

> The Coalition argues that approval of the Initial Decision and Stipulations would rob it of its ability to engage in "horse trading" with respect to its issues of concern

which remain before the ALJ. The Board finds this reasoning to be faulty and disturbing. The Coalition does not, as a matter of law, have the right to prevent other parties from reaching a settlement of issues for consideration by the Board. Particularly in a case as complex and technical as this, the adversary parties themselves are often in the best position to work out the framework of a reasonable resolution of the issues. For this reason, the Courts of this State have acknowledged the strong public policy in this jurisdiction favoring settlement of litigation and will strain to give effect to the terms of a settlement wherever possible.... Such negotiated settlements, which must still be approved by the Board, often provide the parties with a more expeditious resolution of the proceedings and help reduce regulatory lag. In this regard, we would note that the Company's petition to increase its rates was filed in November 1991. The Board's statutes and regulations allow for a nine month statutory suspension period. While it is often virtually physically impossible for a fully litigated case of this magnitude and complexity to be resolved within the nine month period, this Board is committed to the expeditious and fair processing of all rate petitions, including this one. The Board's role in these matters is to balance the interests of the Company and its customers and to insure a timely resolution of these matters in a manner that is reasonable and fair to all parties.

The Board stressed that the Stipulations had been agreed to by Rate Counsel, the statutorily authorized entity to represent the public interest in rate proceedings, and that Rate Counsel had agreed that there is ample support in the record for the Stipulations. The Board also noted similar approval by the ALJ who had presided over the fifty-nine days of hearings and who had reviewed all the evidence.

The Board recognized that the Stipulations did not contain a line-by-line breakdown of each and every item included in rate base or in operating expenses. Nevertheless, it did not find that that was a sufficient reason not to approve them. It noted that:

[S]tipulations of large rate cases necessarily involve compromises among the parties and rarely identify the resolution of each and every issue in a case. Nevertheless, the Board is convinced that, viewed in their entirety, these Stipulations are the result of intense, good faith, arms-length negotiations among many parties who were actively involved in the litigation and settlement phases of this case including the Company, Rate Counsel, Board Staff and numerous intervenors. As the United States Supreme Court noted in *Duquesne Light Co. v. Barasch*, it is not the theory but the impact of a rate order that counts. If the total effect of a rate order cannot be said to be unreasonable, judicial inquiry is at an end. 488 *U.S.* 299, [109 *S.Ct.* 609, 102 *L.Ed.*2d 646] (1989), citing *FPC v. Hope Natural Gas Co.* 320 *U.S.* 591, 602, [64 *S.Ct.* 281, 287–88, 88 *L.Ed.* 333] (1944).

The Board concluded that:

The Board, based on its review of the record in the proceeding, including the testimony and exhibits of the parties, is convinced that, in this case, the overall

result is just and reasonable and that the overall level of rate base, expenses and return is supported by, and within the scope of the record in this proceeding, and that adoption of these Stipulations, which were so carefully crafted by the numerous parties after long and arduous settlement negotiations, is in the public interest.

The Coalition moved for reconsideration on June 4, 1993 and the Board deferred a decision on the motion until the APSO issues were decided.

Meanwhile the APSO issues and the Coalition's fair competition issues continued in litigation. As noted above two days of hearings addressed to those issues had been held at the end of the Base Rate case in August 1992. The evidence developed showed that the APSO program was nonprofit and cost-based. Further, the program had operated at a loss since 1983 and PSE & G was now seeking a rate increase for the services provided. However, PSE & G did not consider the losses to be "material."

A separate program, the replacement parts or "contract" program, was a kind of insurance plan in which a customer paid a flat fee in return for the services and parts needed during the term of the contract. PSE & G's repair personnel, unlike private electrical contractors, were not required to be licensed by the State.

At the August hearings, the Coalition cross-examined two PSE & G witnesses and presented one of its own. The Coalition elicited from PSE & G's witnesses that under the APSO program if a customer's complaint fell within any one of twenty-nine enumerated safety-related areas, PSE & G would repair the problem without charge. If the problem was not among these twenty-nine areas, PSE & G would provide a repair-and-parts estimate and inform the customer that he or she could choose to have the work done by a private contractor.

Norman Adelman testified on behalf of the Coalition. He was a manager of a heating and air conditioning company and also the then chairman of the Coalition. He described the Coalition as comprising about fourteen trade associations of electrical contractors and related business people. Adelman opined that PSE & G enjoyed a competitive advantage over licensed private contractors

because PSE & G was not required to adhere to the National Electrical Code or to use licensed repair persons. He said that PSE & G could perform services for less than the true cost and recover the difference by spreading it among all ratepayers. Moreover, he stated that PSE & G had access to customer lists which gave it a better opportunity to target customers with older equipment likely to need replacement. However, he testified that the Coalition had no objection to PSE & G's providing free repairs for items that were truly safety-related.

Adelman also provided some historical perspective. He referred to an unwritten "covenant" formed between PSE & G and private contractors about forty years earlier, when PSE & G first began selling natural gas. PSE & G had enlisted the contractors' help in selling customers on the benefits of gas. The contractors would then make money by selling gas equipment and appliances to the customers. Under the "covenant," PSE & G would perform emergency repairs only, leaving all other work to the contractors. Adelman said that PSE & G broke the covenant in 1982 or 1983 by offering a repair program at a lower price than the price contractors could afford to offer. This resulted in a loss of business for many of the Coalition members.

On May 20, 1993, the ALJ issued his Initial Decision addressed to the APSO issues. The ALJ agreed with some of the Coalition's points and rejected others. He noted the continued dispute regarding which services were safety-related and recommended that the Board conduct further hearings on this issue.

Consistent with the ALJ's recommendation, the Board conducted hearings on the safety-related issue on September 7 and 10, 1993. PSE & G presented one witness, Richard Comerford, an electrical engineer and general manager of gas-service marketing. Comerford explained the importance of PSE & G's being able to provide diagnostic services free of charge. He stated that absent these free services, some customers would overlook problems or attempt to do their own repairs, creating potential dangers. He said that charges for these services would most impact those least

able to pay for them because approximately seventy percent of service calls were from economically disadvantaged areas. He stated that it was impractical to separately track time allocated to safety and non-safety related work and that customers might be discouraged from seeking service for potentially unsafe gas appliances. Comerford opined that the current "flat pricing" system, as opposed to the Coalition's proposed market-labor pricing, was best for customers and offered no competitive advantage since contractors were free to offer the same system.

Comerford also cited PSE & G's statutory duty to provide safe service, a duty that would be compromised by an order compelling PSE & G to abandon certain no-charge services. He testified that bill inserts were important and should be permitted, because they give customers information necessary to ensure that gas appliances are operating safely. Comerford defined safety-related as "any threat of injury or loss of life and/or damage to property of the ratepayer or the public in general." He said that the decision whether a problem was safety-related was often subjective and could not be made until after an on-site diagnosis. On cross-examination Comerford explained how each of twenty-nine no-charge services was safety-related.

The Coalition presented testimony by a panel of five members including Adelman. Adelman stated that the panel's definition of a safety-related service was "any service that is necessary to put a piece of equipment in a safe condition, safe condition being defined as either turning the unit off [or] disconnecting it." An unsafe condition was "[a]nything that would cause immediate harm or threat to property or person." Adelman opined that only six of the twenty-nine free services deserved that status: gas smells, flashbacks, disconnecting appliances, changing meters, turning off appliances during meter changes, and inspecting utility-owned equipment.

The Board reached its decision on the APSO issues at its December 8, 1993 public meeting. The Board agreed with the ALJ that the Coalition had not proved its theory of "improper

cross-subsidization of the appliance repair programs and the service contract programs by other ratepayers." It also agreed that PSE & G had met its burden of proof as to the reasonableness of its rate requests, but with several exceptions. However, the Board disagreed with the ALJ that hourly labor pricing was better, concluding that the PSE & G's existing flat-pricing method provided consumers with more accurate information and thus fostered fair competition. Further, the Board decreed that charges for diagnostic time be determined as follows:

[O]n all service calls, diagnostic time of fifteen (15) minutes plus associated travel time shall be free of charge. Furthermore, there shall be no charge for additional diagnostic or repair time if, after the diagnosis, it is determined that the work that is required is related to safety. After the first 15 minutes, a charge shall be imposed for diagnostic and repair services that are deemed to be non-safety related, at which time, the Company shall inform the customer that those types of chargeable services are also available from other entities.

The Board reviewed PSE & G's twenty-nine safety-related items and found that eighteen were appropriately safety-related, but that eight items were not safety-related and thus could no longer be offered free of charge. The three other proposed safety-related items had been withdrawn by agreement between PSE & G and the Coalition.

The Board imposed certain conditions for the replacement-parts service contracts in order to mitigate PSE & G's competitive advantage. These included restrictions on on-site marketing activities by PSE & G, and a fifteen-day waiting period between sign-up and availability of the service. The Board permitted PSE & G to use bill inserts but required a disclaimer to explain that competitive services were available from other contractors. Further, PSE & G was required to meet with the Board Staff to review the text of any bill insert prior to its use.

The Board disapproved of part of PSE & G's electric-lighting tariff proposal which gave preferential treatment to higher output lamps because it encouraged the use of greater amounts of electricity which was contrary to the Board's policy of energy efficiency and conservation. The Board agreed with the ALJ that

PSE & G must develop separate tariffs for municipal street lighting and private lighting.

By order of May 11, 1994, the Board denied the Coalition's motion for reconsideration of its May 14, 1993 Final Order which had been held in abeyance until the Board issued its decision on the APSO issues. This appeal followed.

We denied the Coalition's motion for partial summary disposition in an order dated November 27, 1995. We also denied the Coalition's motion to supplement the record and to accelerate the appeal in separate orders dated June 19, 1996. On the same date we granted cross-motions by the Board and PSE & G to strike portions of the Coalition's brief.

## II

Initially, we note some general principles in a rate case. The standard of review we must follow in reviewing an order of the Board is set forth in *N.J.S.A.* 48:2-46.

> The Superior Court, appellate division is hereby given jurisdiction to review any order of the board and to set aside such order in whole or in part when it clearly appears that there was no evidence before the board to support the same reasonably or that the same was without the jurisdiction of the board.
>
> No order shall be set aside in whole or in part for any irregularity or informality in the proceedings of the board unless the irregularity or informality tends to defeat or impair the substantial right or interest of the appellant.
>
> [*N.J.S.A.* 48:2-46.]

■ Our Supreme Court has observed that "rate making is a legislative and not a judicial function, and that the Board of Public Utility Commissioners, to which the Legislature has delegated its rate making power, is vested with broad discretion in the exercise of that authority." *Public Serv. Coordinated Transport v. State*, 5 *N.J.* 196, 214, 74 *A.*2d 580 (1950). Further, "the Board's rulings are entitled to presumptive validity and will not be disturbed unless we find a lack of 'reasonable support in the evidence.'" *In re Petition of Jersey Central Power & Light Co.*, 85 *N.J.* 520, 527, 428 *A.*2d 498 (1981) (quoting *In re N.J. Power & Light Co.*, 9 *N.J.* 498, 509, 89 *A.*2d 26 (1952)).

 The Board is charged with the responsibility to fix just and reasonable rates when the Board determines that any existing rate is "unjust, unreasonable, insufficient or unjustly discriminatory or preferential." *N.J.S.A.* 48:2–21(b)1. The burden of proof to show that the proposed rates are just and reasonable is upon the utility. *N.J.S.A.* 48:2–21(d). As part of its proof, the utility must prove: (1) the value of its property or the rate base, (2) the amount of its expenses, including operations, income taxes, and depreciation, and (3) a fair rate of return to investors. *See In re Jersey Cent. Power & Light, supra,* 85 *N.J.* at 529, 428 *A.*2d 498.

 The Board is required to justify its rate-setting orders with specific fact-findings on each of the three elements of proof, rate base, expenses, and fair rate of return, and on the general issue of whether the chosen rates are "just and reasonable." *Central R. Co. of N.J. v. Department of Pub. Utils.,* 7 *N.J.* 247, 266, 81 *A.*2d 162 (1951); *see In re Petition of Bergen County Utils. Auth.,* 230 *N.J.Super.* 411, 415, 553 *A.*2d 849 (App.Div.1989). The Administrative Procedure Act (APA), *N.J.S.A.* 52:14B–1 to –24, requires the Board to set forth the findings of fact and include an explicit statement of the underlying facts supporting the findings. However, the "final decision may incorporate by reference any or all of the recommendations of the administrative law judge." *N.J.S.A.* 52:14B–10(d); *accord New Jersey Dep't of Pub. Advocate v. New Jersey Bd. of Pub. Utils.,* 189 *N.J.Super.* 491, 499–500, 460 *A.*2d 1057 (App.Div.1983).

 The Board is not required to employ any particular mode of computing rates, but it must reach a result that is supportable:

It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important.

[*Federal Power Com. v. Hope Nat. Gas Co.,* 320 *U.S.* 591, 602, 64 *S.Ct.* 281, 288, 88 *L.Ed.* 333, 345 (1944); *accord Transcontinental Gas Pipe Line Corp. v. Bernards Township,* 111 *N.J.* 507, 525, 545 *A.*2d 746 (1988).]

Thus, in calculating rates the Board is free to make "pragmatic adjustments" designed to fit the circumstances, and we "need not

address at any length the particular flaws isolated by appellants." *In re Application of N.J. Bell Tel. Co.*, 291 *N.J.Super.* 77, 91, 92, 676 *A.*2d 1133 (App.Div.1996).

### III

We now address the Coalition's contentions that the Board breached its duty to make findings of fact on each of the three components of a reasonable-rate decision, and that the Board improperly adopted the Stipulations without independently assessing the data on which the Stipulations were based.

We have found no New Jersey case that expressly considered whether the Board abdicates its statutory duty when it adopts stipulations in a contested rate case on the requisite elements of proof. It is clear, however, that the Board may not simply accept the utility's own "books of account at face value." *Public Serv. Coordinated Trans. v. State, supra*, 5 *N.J.* at 218, 74 *A.*2d 580.

A review of some relevant cases is helpful in reaching our decision. The case of *Department of Public Advocate v. New Jersey Board of Public Utilities*, 206 *N.J.Super.* 523, 503 *A.*2d 331 (App.Div.1985), involved a water company that petitioned for a rate increase. *Id.* at 524–25, 503 *A.*2d 331. The company and the Board entered into a stipulation setting the new rates. The stipulation was adopted by the ALJ and the Board. *Id.* at 526, 503 *A.*2d 331. On appeal no one disputed the Board's authority to enter into the stipulation. Rather, the Public Advocate complained that the Board had modified a key term of the stipulation without giving the parties a chance to be heard. *Id.* at 527, 503 *A.*2d 331. We agreed that the stipulation should be strictly enforced and stated:

In our view the beginning point of this analysis is the strong public policy in this state in favor of settlements. *Pascarella v. Bruck,* 190 *N.J.Super.* 118, 125 [462 *A.*2d 186] (App.Div.1983), *certif. den.* 94 *N.J.* 600 [468 *A.*2d 233] (1983). The point of this policy is not the salutary effect of settlements on our overtaxed judicial and administrative calendars (although this is an undeniable benefit) but the notion that the parties to a dispute are in the best position to determine how to resolve a

contested matter in a way which is least disadvantageous to everyone. In recognition of this principle, courts will strain to give effect to the terms of a settlement wherever possible. It follows that any action which would have the effect of vitiating the provisions of a particular settlement agreement and the concomitant effect of undermining public confidence in the settlement process in general, should not be countenanced.

[*Id.* at 528, 503 *A.*2d 331.]

While we did not address the statutory authorization for the Board to utilize the stipulation, from a public policy viewpoint, we found no objection to the mechanism used.

The Coalition relies on *In re Intrastate Industrial Sand Rates by Central Railroad Co. of New Jersey,* 66 *N.J.* 12, 327 *A.*2d 427 (1974), in support of its argument that the Board could not adopt the Stipulations. There, the Board granted a rate increase to a railroad based upon a negotiated agreement and expressly declined to compel the railroad to proffer evidence as to rate base and rate of return. *Id.* at 16–17, 327 *A.*2d 427. The Board found in a conclusory fashion that the purported rates were "just and reasonable." *Id.* at 17, 327 *A.*2d 427. The Court held that the Board lacked the power to approve a permanent rate increase without first computing the rate base and the rate of return. *Id.* at 26, 327 *A.*2d 427. It observed that the statute permitted the Board to dispense with finding the rate base only in the three circumstances described in *N.J.S.A.* 48:2–21.2, which were not applicable. 66 *N.J.* at 18, 29, 327 *A.*2d 427. Further, the Court noted that the Board's power to negotiate rates was confined to the interim adjustment of rates during the pendency of a hearing, as permitted by *N.J.S.A.* 48:2–21.1. 66 *N.J.* at 26, 327 *A.*2d 427.

Contrary to the Coalition's contention, we do not understand *Industrial Sand* to hold that the Board may not adopt stipulations. In *Industrial Sand,* the Court was not called upon to consider the propriety of the Board expressly adopting stipulations as its own findings. Rather, the Court rejected the Board's express relieving of the utility of its burden to prove rate base and fair return, two necessary elements of a rate-increase petition. In the present case, the record contained evidence of the rate base, expenses, and rate of return, and the Board accepted the Stipula-

tions as constituting the requisite proof of those elements. The Coalition also argues that *In re Revision of Rates Filed by Redi–Flo Corp. of New Jersey,* 76 *N.J.* 21, 384 *A.*2d 1086 (1978), is support for the proposition that the Board's fact-finding duty cannot be excused by the Rate Counsel's acquiescence in a settlement. In *Redi–Flo,* an oil company petitioned the Board for a rate increase under *N.J.S.A.* 48:2–21.2, subd. 1(a), the statute permitting rate-setting without a conventional rate hearing in three exceptional circumstances. 76 *N.J.* at 27, 384 *A.*2d 1086. Rate Counsel did not contest the applicability of *N.J.S.A.* 48:2–21.2, subd. 1(a). 76 *N.J.* at 29, 384 *A.*2d 1086. The Court held that the Board was required to make findings that the criteria of that statute had been satisfied. *Id.* at 35–36, 384 *A.*2d 1086. The Court reaffirmed the principle that the Board must make specific factfindings and that courts will not supply findings by implication. *Id.* at 35, 384 *A.*2d 1086. However, nowhere in *Redi–Flo* is it stated that the Board may not adopt a stipulation that establishes rates it finds to be "just and reasonable." Consequently, *Redi–Flo* does not control the disposition of this case.

The majority of courts from other jurisdictions have held that a utility agency may adopt stipulations as fact-finding tools, as long as it evaluates the stipulations and expressly finds that the stipulations satisfy the statutory elements of proof.

In *Mobil Oil Corp. v. Federal Power Commission,* 417 *U.S.* 283, 94 *S.Ct.* 2328, 41 *L.Ed.*2d 72 (1974), after extensive hearings, the Federal Power Commission (FPC) adopted a natural-gas rate structure for the Southern Louisiana area. *Id.* at 292, 94 *S.Ct.* at 2338, 41 *L.Ed.*2d at 86. Three years later it reopened the matter and conducted further hearings. *Id.* at 296, 94 *S.Ct.* at 2339–40, 41 *L.Ed.*2d at 88. At the same time it presided over settlement conferences which culminated in a settlement proposal agreed to by a large majority of all interests. *Id.* at 297, 94 *S.Ct.* at 2340, 41 *L.Ed.*2d at 89. The FPC evaluated the proposal in light of all the hearings, concluding that the proposed rates were "just and reasonable" within the meaning of the rate-setting provisions of

the Natural Gas Act, 15 *U.S.C.A.* § 717. 417 *U.S.* at 298, 94 *S.Ct.* at 2340, 41 *L.Ed.*2d at 89. One issue on appeal was whether the FPC had the power "to adopt as a rate order a settlement proposal that lacks unanimous agreement of the parties to the proceeding." *Id.* at 312, 94 *S.Ct.* at 2348, 41 *L.Ed.*2d at 97. The Court held that the agency did have that power. First, it noted that the FPC did not blindly accept the proposal as being just and reasonable. *Id.* at 313, 94 *S.Ct.* at 2348, 41 *L.Ed.*2d at 98. Rather, the FPC "weighed its terms by reference to the entire record." *Ibid.,* 417 *U.S.* at 313, 94 *S.Ct.* at 2348, 41 *L.Ed.*2d at 98. Second, the lack of unanimity, while sufficient to defeat the proposal's status as a "settlement," did not preclude the agency from considering the proposal on its merits. *Id.* at 313–14, 94 *S.Ct.* 2348, 41 *L.Ed.*2d at 98. Thus, the FPC was free to make an independent finding, grounded in substantial evidence in the record, that the proposed rates were "just and reasonable." *Id.* at 314, 94 *S.Ct.* at 2348, 41 *L.Ed.*2d at 98. Finally, the *Mobil* Court deferred to the FPC's choice of how to structure a rate order: "The choice of an appropriate structure for the rate order is a matter of Commission discretion, to be tested by its effects [and] ... is not the less appropriate because the Commission did not conceive of the structure independently." 417 *U.S.* at 314, 94 *S.Ct.* at 2348, 41 *L.Ed.*2d at 98; *see also El Paso v. Public Util. Comm'n of Texas,* 883 *S.W.*2d 179, 183–84 (Tex.1994) (Commission had the power to adopt the non-unanimous stipulation as its disposition of the case).

Similar conclusions were reached in several State cases. *See Bryant v. Arkansas Pub. Serv. Comm'n,* 46 *Ark.App.* 88, 877 *S.W.*2d 594, 599–600 (1994) (Commission's statutory authority is broad enough to allow stipulations entered into by some of the parties to a proceeding in rate regulations); *Office of Consumers' Counsel v. Public Utils. Comm'n of Ohio,* 64 *Ohio St.*3d 123, 592 *N.E.*2d 1370, 1373 (1992) (Public Utility Commission, while not bound by stipulation, was entitled to place substantial weight on its terms, as long as it found that the resulting rates were "just and reasonable" and were supported by the evidence); *In re*

*Woonsocket Water Dep't,* 538 *A.*2d 1011, 1014 (R.I.1988) (Public Utilities Commission's adoption of stipulations in fixing water rates was within its discretion in basing its decision on the stipulations). *Cf. Application of Wilmington Suburban Water Corp.,* 203 *A.*2d 817, 832–34 (Del.Super.1964), *rev'd in part on other grounds,* 211 *A.*2d 602 (Del.1965) (remanding to the Public Service Commission for fact-finding because the Commission had accepted stipulation as to the rate base and rate of return without conducting any hearings and without making findings concerning the reasonableness of the stipulation); *In re New England Tel. & Tel. Co.,* 135 *Vt.* 527, 382 *A.*2d 826, 835–36 (1977) (finding error where Public Service Board, without conducting evidentiary hearings, granted rate increase to telephone company by adopting stipulation between company and Board counsel).

 We garner from these cases that, so long as the Board independently examines the existing record and expressly finds that the stipulated figures yield rates that satisfy the statutory standard, the Board may adopt the stipulations. Moreover, it is important that most of the active parties participate in negotiating the settlement and that the non-consenting parties be given an opportunity to argue against the stipulations. Further, the rate order based on stipulations must yield rates that are just and reasonable.

 Here, the Coalition contends that the Board adopted the Stipulations without independently analyzing the record and making detailed fact-findings as to each of the three required elements of proof, i.e., rate base, expenses, and rate of returns. PSE & G disputes the Coalition's contentions and urges that it is sufficient that the Board address items that are crucial to its decision. Further, PSE & G insists that the Board adequately weighed the key evidence and found that the Stipulations were supported by the evidence. In its brief on appeal, the Board also claims to have independently assessed the record before deciding to accept the Stipulations.

We are convinced that the strong public policy in New Jersey in favor of settlements coupled with the particular facts of this case support the Board's approval of the Stipulations. *See Department of Pub. Advocate v. New Jersey Bd. of Pub. Utils., supra,* 206 *N.J.Super.* at 528, 503 *A.2d* 331. It is undisputed that the Stipulations were executed not until fifty-nine days of hearings before the ALJ. Thus, the Board had a complete record against which the Stipulations could be measured. Even though the ALJ merely cited the Stipulations and concluded that they resulted in fair and reasonable rates, he had heard all of the evidence. Thus, he accepted the Stipulations only after a full record had been developed.

Most importantly, the Board noted that it made a searching inquiry and did not simply incorporate the Stipulations. The Board summarized the key provisions of each Stipulation before finding that the Stipulations yielded "just and reasonable" rates. It noted that all active parties, including Rate Counsel, the party representing the public interest, had engaged in "intense, good faith, arms-length negotiations."

Moreover, the Board noted that it "carefully reviewed" the record and "carefully considered" the Coalition's exceptions. The Coalition questioned the Board's ability to "carefully" review the record because the Board's decision was made within two weeks after the ALJ issued his decision. However, the Board Staff had been actively involved in the negotiations for nearly four months after the conclusion of the hearings. We see no reason to doubt the Board's representation as to the depth of its review of the record.

Further, the Board found that the Coalition could have joined in the negotiations leading to the Stipulations, but failed to do so. In any event, the Coalition presented its challenge to the Stipulations before the Board and raised objections in its exceptions to the ALJ's decision. We are satisfied that the Coalition, as a non-consenting party, nonetheless had the opportunity to be heard on the merits of the Stipulations.

We conclude that the Board had the power to and reasonably did accept the Stipulations as its fact-findings, which satisfied the required components for a rate case. The record amply supports the Board's conclusion that PSE & G met its burden of proof to justify the rate increase ordered.

## IV

We now consider the Coalition's challenges addressed to the Board's APSO decision. In various arguments, the Coalition contends that the Board's decision was arbitrary and capricious and was unsupported by substantial evidence in the record. Further, the Coalition claims that the Board improperly shifted the burden of proof on the cross-subsidization issue.

As noted above, the Board's January 27, 1994 decision modified the ALJ's May 20, 1993 Initial Decision. The Coalition urges that the Board failed to explain its disagreement with the ALJ's decision.

■ Contrary to the Coalition's contention, the Board need not discuss every point of disagreement with the ALJ. So long as the Board "evaluated those differences with the ALJ which were crucial to its decision, it fulfilled its duty." *New Jersey Dep't of Pub. Advocate v. New Jersey Bd. of Pub. Utils.*, 189 *N.J.Super.* 491, 505, 460 *A.*2d 1057 (App.Div.1983).

■ In this regard, the Coalition contrasts the Board's alleged failure to define "safety-related" with the ALJ's guideline "in those areas where the services provided are clearly safety-related, the Company should continue to provide them at no charge to its customer." We disagree with the Coalition's premise that the ALJ's "guideline" was a detailed standard that the Board was obligated to either adopt or explain its rejection. In fact, the ALJ had recommended that the Board develop a record as to which items were safety-related. Thus, the ALJ deferred to the Board on the safety-related issues and did not decide the issue.

Thereafter, the Board evaluated each of the twenty-nine services designated as safety-related and determined that eighteen qualified for this designation. At the conclusion of its findings on the safety-related items, the Board added:

> In making the above determinations, we have been guided by the general principle that this Board has an obligation to insure that utilities provide safe, adequate and proper service to customers and where the safety related nature of some of these services has been in genuine dispute we have leaned on the side of caution and public safety and welfare, consistent with our regulatory obligation.

We are convinced that the Board's action was a fair resolution of the safety issue. There was sufficient credible evidence in the record to support the Board's findings. Moreover, the Board did not reject or even modify the ALJ's disposition of the safety issue. As noted above, the ALJ had made no disposition of that issue, but rather expressly deferred it to the Board pending further hearings. Hence the Board's resolution of that issue was the first and only one in the case.

The Coalition also claims that the Board failed to justify its selection of a flat pricing as the pricing methodology rather than the actual cost recommended by the ALJ. However, the Board explained its reason for selecting the flat pricing method as follows:

> With respect to the pricing methodology to be utilized, the Board disagrees with the recommendation of the ALJ and *FINDS* that the flat pricing methodology should continue to be used for competitive services. The Board concurs with the position of the Company on this issue that under the flat pricing methodology the customers will know exactly what the total cost of performing the repair will be prior to commencing with the repair and as such, they will be in a better position to compare the full job costs charged by the Company with the cost of the same job as performed by an independent contractor. The Board believes that the customers are provided with better information under the flat pricing methodology. Moreover, taken in conjunction with the other modifications described below, we believe that the revised modified flat pricing methodology will also serve to ameliorate losses experienced by the APSO program. We note that just because these programs have experienced losses in the past does not lead to a conclusion that there has been improper cross-subsidization. We have seen no such evidence of any improper cross-subsidization.

There was substantial evidence in the record to support the Board's findings. We must give due deference to the

Board in making this determination. *In re Jersey Cent. Power & Light Co., supra,* 85 *N.J.* at 527, 428 *A.*2d 498; *see In re Application of N.J. Bell,* 291 *N.J.Super.* at 88–89, 676 *A.*2d 1133. Moreover, the Board was not compelled to grant the ALJ any special deference on this point.

▓▓▓ With respect to the cross-subsidization and burden of proof issue, the Board agreed with the ALJ that "the Coalition ha[d] not demonstrated any clear, compelling or credible evidence of improper cross-subsidization of the appliance repair programs and the service contract programs by other ratepayers." The Coalition argues that this finding is erroneous because the Board shifted the burden of proof to the Coalition.

Contrary to the Coalition's contention, the Board consistently recognized that PSE & G had the burden of proving the ultimate issue, namely, that its rate proposals were "just and reasonable." Further, at one point the Board concurred with the ALJ that PSE & G had met its burden of proving the reasonableness of its proposed modification. Thus, the Board did not shift the burden of proof but noted that a party raising a defense to the moving party's claim bears the burden of coming forward with evidence to support that defense. *See, e.g., Citibank v. Estate of Simpson,* 290 *N.J.Super.* 519, 533, 676 *A.*2d 172 (App.Div.1996). The Board was satisfied that the Coalition had not presented sufficient evidence to overcome the evidence presented by PSE & G.

▓▓▓ The Coalition further argues that the Board's decision with regard to the appliance-servicing contracts was arbitrary and not supported by the record. The Coalition argued before the ALJ that the contract program was improperly subsidized by participants who do not need service in a particular year. The ALJ found this argument to be "meritless," reasoning that "with any service contract there is no way of knowing if a participant will need the services during the term of the contract" and that "loss experience dictates the level of rates charged." He found the Coalition's allegations to be "conceptually flawed" and rejected them. The Board summarily adopted the ALJ's ruling that the

Coalition had not proved its theory of cross-subsidization of either the APSO order or the contract program. However, the Board imposed four conditions on the contract program to insure fair competition:

a) On-site marketing by the Company shall be limited to handing out the contract repair service telephone number; b) Costs of the Company's incentive program shall be allocated to the specific service contract programs; c) A fifteen-day waiting period shall be established between the time the customer signs the service contract and the availability of the service; and d) The Company may use bill inserts but shall include a disclaimer stating that the services are competitive services that are available from other[ ] purveyors such as heating contractors, plumbers, etc. The Company shall meet with Staff to review the text of the bill insert prior to its use.

We find no abuse of discretion in the Board's decision approving the contract program with the restrictions noted. The Board's adoption of the ALJ's reasoning does not evidence arbitrariness. Moreover, the Board is authorized by statute to adopt the reasoning of the ALJ where the Board finds it appropriate.

■ The Coalition also asserts that the Board did not state the level of rate increase it was approving. The Coalition recognizes that PSE & G asked for an average increase of 13.6% per the APSO order from the rates, but nevertheless urges that the Board never articulated that it was approving that level of rates. PSE & G argues that "there was no need" for the Board to set a specific percentage increase because the APSO order approved the Customer Service Pricing Schedule proposed by PSE & G in its October 1, 1991 petition.

We agree with PSE & G's position. In the APSO order, the Board adopted the ALJ's decision except as modified. None of the modifications related to the amount of the rate increase. The ALJ had held that PSE & G sustained its burden of proof in demonstrating the reasonableness of the proposed rates. Thus, the "proposed rates" were those contained in PSE & G's original petition which the Board approved.

■ Finally, we address the Coalition's contention that the Board's decision to permit PSE & G to use bill inserts to advertise

its services was arbitrary, capricious, and not based on substantial evidence in the record.

The ALJ had agreed with the Coalition that:

[T]he Company's ability to use bill inserts provides them with a significant competitive advantage over independent contractors and Coalition members. The costs of billings are spread over the entire rate payer base of Public Service Electric and Gas Company, including both electric and gas customers, some of whom because of their geographic position in the State are not able to receive gas from Public Service either because they are served by other gas utilities or because Public Service has not run lines to serve them. The cost of direct advertisement to prospective customers in competitive areas should not be borne by the Company's general ratepayers. I therefore CONCUR with the Coalition and Staff that this practice should be discontinued and direct that the Company henceforth refrain from using bill inserts to publicize inherently competitive services.

Following the ALJ's decision, this issue was addressed before the Board during the two hearings devoted to the safety-related issues. Comerford testified on behalf of PSE & G in part:

PSE & G maintains that bill inserts provide ratepayers with information about the availability of services that are necessary to ensure gas appliances are operating safely. We believe there is nothing inherently wrong with a utility attempting to market its gas appliance services. PSE & G has provided legal argument supporting our right to continue the use of bill inserts. In addition, there are safety concerns associated with hampering PSE & G's ability to advertise the service it offers. Informing ratepayers that PSE & G offers gas appliance service, does not prevent the ratepayer from calling someone else for service. It does however insure that ratepayers who are unable to acquire service from independent contractors are aware that these services are available to them.

On behalf of the Coalition, Adelman testified that allowing PSE & G to use bill inserts would give PSE & G a competitive advantage because the cost of such advertising was spread among all rate-payers.

By 2–1 vote, the Board allowed bill inserts but also required "a disclaimer stating that these services are provided by competitive services available from other purveyors such as heating contractors, plumbers, et cetera." The Board justified the bill-insert limitation as being necessary to insure that the Company is a fair competitor and does not have special advantage over other providers in the industry. The dissenting commissioner agreed with the

ALJ's recommendation to ban the use of bill inserts because it gave PSE & G a competitive advantage.

The Board was not bound to adopt the ALJ's reasoning. By a divided vote, the Board was satisfied that the reasons advanced by PSE & G justified approval of bill inserts. Even so, the Board imposed certain restrictions in an effort to insure that PSE & G did not have a special advantage over its competition. The Board, in approving bill inserts with restriction, relied on PSE & G's evidence that information provided in the bill inserts would aid the customers by informing of services available that are necessary to ensure that gas appliances were operating safely. Thus, the Board reached a fair balance between the positions advocated by the parties. There was substantial evidence in the record for the Board to reach this result.

We find no merit to the Coalition's remaining arguments addressed to the APSO order. *R.* 2:11–3(e)(1)(D) and (E).

Affirmed.