IN THE MATTER OF THE APPLICATION OF ROCKLAND ELEC-
TRIC COMPANY FOR APPROVAL OF A CHANGE IN ITS
FUEL CHARGE TO BE EFFECTIVE JANUARY 1, 1987.

NEW JERSEY DEPARTMENT OF THE PUBLIC ADVOCATE,
APPELLANT, v. NEW JERSEY BOARD OF PUBLIC
UTILITIES, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued December 5, 1988—Decided March 2, 1989.

480

Before Judges J.H. COLEMAN, DEIGHAN and BAIME.

*Irene Jones*, Deputy Public Advocate, argued the cause for appellant New Jersey Department of the Public Advocate, Rate Counsel (*Alfred A. Slocum*, Public Advocate, attorney; *Ellen B. Maughan*, Assistant Deputy Public Advocate, on the brief and reply brief).

*Stephen B. Genzer* argued the cause for respondent Rockland Electric Company (*Stryker, Tams & Dill*, attorneys; *Ste-*

*phen B. Genzer,* of Counsel, *Richard B. McGlynn* and *Beverly A. Sharpe* on the brief).

*Gail Lambert,* Deputy Attorney General, argued the cause for respondent New Jersey Board of Public Utilities (*Cary Edwards,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of Counsel; *Carla Vivian Bello,* Deputy Attorney General, on the letter brief).

PER CURIAM.

This matter involves a dispute between Rockland Electric Company (Rockland), a public utility, and the Office of the Public Advocate, Division of Rate Counsel (Rate Counsel), regarding an adjustment in Rockland's Levelized Energy Adjustment Clause (LEAC). The Public Advocate appeals from a decision of the Board of Public Utilities (Board) which, among other things, approved Rockland's request to reduce its LEAC by $9.8 million. Rate Counsel contends that the Board adopted a proposal based on matters outside of the record below in violation of the Administrative Procedure Act (APA), *N.J.S.A.* 52:14B–1 *et seq.* and thereby denied the parties' procedural due process guarantees. Rate Counsel further contends that the increase in the base rate to include construction and renovation projects at Rockland's Lovett and Rio generating units does not provide "just and reasonable" rates as required by *N.J.S.A.* 48:2–21(d).

On September 12, 1986, Rockland filed a petition with the Board for approval of a voluntary reduction of revenue in the amount of $6.6 million in its 1987 LEAC. The matter was transferred to the Office of Administrative Law (OAL) and assigned to an Administrative Law Judge (ALJ), who held an evidentiary hearing following a public hearing.[1] At the hearings, Rate Counsel represented the public interest as a statutory party, pursuant to *N.J.S.A.* 52:27E–18. The Board Staff

---

[1]No verbatim transcript of the public hearing exists.

(Staff), represented by a deputy attorney general, also appeared in the proceeding. Only Rockland and Rate Counsel presented testimony.

On December 17, 1986, Rockland filed an interlocutory appeal with the Board from the ALJ's ruling which rejected Rockland's request to include in its proposed LEAC rates the impact of the Tax Reform Act of 1986. On December 18, 1986, the Board rejected that appeal as moot but, over the objections of Rate Counsel, the Board issued an initial decision and order approving the reduction in the LEAC of $9.8 million to Rockland's customers, effective January 1, 1987. Since this reduction was authorized on an interim basis only, the Board ordered that the final amount of the LEAC be determined in the proceedings before the ALJ after a full hearing.

On March 30, 1987, after the record was closed, the ALJ filed an initial decision with the Board. On April 20, 1987, Rockland filed exceptions to the initial decision and Rate Counsel subsequently moved to strike a part of Rockland's exceptions. After an extension of the 45–day statutory period for reviewing the initial decision, on June 12, 1987, the Board issued its decision and order modifying and adopting the initial decision. On June 25, 1987, this order was amended to correct typographical errors and to revise tariff provisions by the amended order.

Rate Counsel appealed to this court and on December 4, 1987, the Board issued a subsequent order which, among other things, accepted revised tariff sheets submitted by Rockland, pursuant to the Board's order of June 12, 1987.

## Introduction

■ A utility may normally increase its rates only by instituting base rate proceedings. In order to do so, the utility must file a petition with the Board to change base rates. The filing is normally followed by a hearing wherein the utility has the burden of proving the value of utility property, the amount of its operation, maintenance, tax, depreciation and other expenses

and the level of a fair rate of return to investors. After an examination of the utility's showing on all of these factors, the Board may set base utility rates, which by statute must be "just and reasonable." *See N.J.S.A.* 48:2–21(d).

■ Rockland, like other electric and gas utilities, may also change rates once a year by petitioning the Board to modify its fuel adjustment clause. The clause allows a utility to annually adjust rates to reflect changes in just one component of the overall level of utility base rates—the cost of fuel. In other words, the LEAC allows the utility to expeditiously pass through to ratepayers fuel cost increases or decreases.

■ An "energy" or "fuel" adjustment clause is a widely used and judicially accepted rate-making mechanism used to recover certain components of fuel costs incurred by a utility. Originating during the energy crisis of the 1970's, energy adjustment clauses are designed to permit a utility to include in rates initial estimates as to future fuel costs and to make subsequent periodic adjustments to reflect actual costs when ascertained.

■ In ruling on a utility's LEAC petition following a hearing, the Board must ultimately determine the reasonableness of the company's fuel cost projections and set an appropriate fuel factor. At the same time, it must reconcile the fuel related revenues and expenses of the preceding twelve months by increasing or decreasing the fuel clause to reflect any fuel-related revenue surplus or deficiency, commonly referred to as an "overrecovery" and "underrecovery". This overrecovery or underrecovery accrues to the utility due to the difference between the fuel costs allowed in rates by the Board in the previous year's LEAC proceeding and the actual fuel costs incurred the previous year.

### Rockland's LEAC Petition

In September 1986, Rockland filed a petition with the Board to approve a $6.6 million fuel adjustment clause reduction.

Rockland supported its request for a decrease by projecting fuel costs lower than those of 1986. Rockland also submitted that it would realize additional fuel cost savings in 1987 as a result of construction and renovation projects at its Lovett and Rio generating units scheduled to be completed that year. Lovett Unit Nos. 4 and 5, which formerly burned only oil, were being converted in 1987 to allow coal burning. Rockland was also reconstructing a penstock or viaduct at its Rio hydroelectric facility to allow that plant to again generate electricity. The petition and revised exhibits further showed that a significant portion of the requested decrease was attributable to the reconciliation offset of a large overrecovery accrued by Rockland through its 1986 fuel adjustment clause.

In addition to including projections regarding the fuel costs Rockland would incur during 1987, the petition included a proposal that the estimated construction costs for the Lovett and Rio projects be passed on to ratepayers through the fuel adjustment clause in 1987, subject to a reconciliation in 1988 when actual project costs became available. Adding this factor to the LEAC would thus decrease the rate reduction that ratepayers would have experienced if only fuel costs were considered. Rockland also proposed that the Board allow it to include the full annualized "carrying costs" of the Lovett and Rio projects in base rates effective January 1, 1988, without the necessity of filing a petition to increase base rates and having the Board holding a hearing.

At an evidentiary hearing before an ALJ, Rate Counsel took the position that a $19 million LEAC reduction was warranted. This position was based on the testimony of Rate Counsel's witness, Robert J. Henkes, regarding projected lower fuel costs. Rate Counsel's argument that a $19 million reduction was warranted was also based on its opposition to Rockland's proposal to include the Lovett and Rio construction costs in the LEAC. The Board Staff also opposed this proposal.

On December 18, 1986, the Board voted to authorize an interim reduction of $9.8 million in the LEAC. Rate Counsel had opposed this reduction on the basis that the $9.8 million figure improperly included approximately $5 million in construction costs for the Lovett and Rio projects. However, the Board's order, dated January 26, 1987, stated that the interim reduction "reflect[ed] an estimated reduction in fuel costs and [did] not reflect any ratepayer payment for the cost" of the Lovett and Rio projects. Despite this statement, Rate Counsel insists in this appeal that the $9.8 million reduction included the Lovett and Rio costs.

On March 20, 1987 the ALJ filed his initial decision which essentially endorsed Rate Counsel's average price methodology for deriving fuel costs and which rejected Rockland's proposal to include the Lovett and Rio carrying charges in the fuel clause adjustment. Based upon his findings and the calculations of the parties, the ALJ recommended that Rockland's LEAC be increased by $4.363 million thus resulting in an total reduction, in addition to the $9.8 million, of $14.163 million.

Rockland, pursuant to *N.J.S.A.* 52:14B-10(c), filed exceptions to the initial decision. Rockland took exception to the ALJ's findings as to fuel prices and his disallowance of the Lovett and Rio carrying costs. In addition, Rockland proposed in its exceptions the following "alternate plan" for charging the carrying costs to ratepayers:

1. Make the 1987 LEAC permanent at its Board-ordered interim level ($9.8 million reduction).

2. Effective at the conclusion of the LEAC proceeding, include the costs of the Rio project in base rates. In addition, reduce Rockland's base rates to reflect the tax savings associated with [the 1986 Tax Reform Act], the pension cost savings associated with FASB-87 [Statement of Financial Accounting Standards No. 87] and a reduction from 14% to 12.75% in the return on equity applied to Rockland's rate base.

3. Effective October 1, 1987, reflect the costs of the Lovett conversion in base rates. At the same time, reduce, in equal amount, the base cost of fuel.

4. Effective January 1, 1988, further reduce base rates to reflect the additional impact of [the 1986 Tax Reform Act].

5. Rockland would agree not to initiate any application for base rate relief to become effective prior to January 1, 1989.

In response to this proposal, Rate Counsel filed a motion to strike the portion of Rockland's exceptions containing the new proposal on the basis that the proposal was beyond the administrative record.

On June 12, 1987, the Board issued its decision and order which rejected in many respects the ALJ's recommendation of projected oil prices, the cost of gas purchases, the cost of purchase of power from other sources and adopted projected prices for those sources of energies which were more favorable to Rockland. In addition, the Board rejected the ALJ's recommendation that the Lovett and Rio construction costs not be considered in the LEAC petition. The Board also rejected Rate Counsel's argument that the carrying costs related to those proposed capital projects did not belong in a fuel clause and held that that contention ran counter to the purpose of the fuel clause. The Board held that it

has the authority in petitions which are filed by utilities for the recovery of charges in the cost of energy and in certain circumstances to examine and decide issues which are in effect related to fuel costs and have a positive and beneficial effect on ratepayers. The issues of the reconstruction of the Rio Hydroelectric penstock and the Lovett conversion carrying costs presented by Rockland Electric in this LEAC petition warrant such action by the Board.

\* \* \* \* \* \* \* \*

The Board definitely believes that these carrying costs should be included in the base rate through this LEAC proceeding, *since these projects were carried out in the public interest at the urging of the Board.* This action by the Board insures adequate rate stability to the ratepayers. The Board after an extensive review of these proceedings is satisfied that the consumer was afforded sufficient public notice as well as a public hearing held pursuant to *N.J.S.A.* 48:2–32.6. There was full participation in these proceedings held before the Office of Administrative Law by the Public Advocate and Board's Staff, and thus [sic] insures full protection to the ratepayer as well as providing a system of checks and balances that has resulted in a fair and equitable process to all parties. [Emphasis supplied.]

Next, the Board rejected Rate Counsel's motion to strike. The Board then adopted the provisions of Rockland's alternate proposal, with one modification. Although Rockland had pro-

posed to not initiate a base rate case before January 1, 1989, the Board adopted an effective date of July 1, 1989. Lastly, the Board instructed its Staff to monitor and review the costs related to Lovett and Rio prior to the next LEAC or base rate proceedings.

In accordance with the Board's Order of June 12, 1987, on September 30, 1987 Rockland filed revised tariff sheets reflecting the annual carrying costs of the Lovett and Rio projects. "By terms of the [Board's] Order, the filing was to take the form of an increase in the non-fuel portion of base rates offset by an identical reduction in the average cost of fuel and thus create a zero impact upon customer bills."

Rockland initially sought to increase the non-fuel component of base rates by $9,153,000 and reducing the average cost of fuel by an identical amount. However, the Board Staff, after reviewing the matter, suggested increasing the non-fuel component of base rates and decreasing the average cost of fuel by $8,903,000. On November 17, 1987, Rockland accepted the Staff's proposed changes.

On December 4, 1987, the Board entered an Order which accepted "a revised Statement of Fuel Cost Adjustment tariff sheet reflecting a reduction in the average and base cost of fuel components of $8,846,000 resulting in a zero impact upon customer rates." The order also directed Rockland to record in a deferred account any future reduction to the Rio and Lovett cost calculations resulting from a reduction by the Federal Energy Regulatory Commission of the rate of return on equity awarded by the Board.

Rate Counsel then filed an Amended Notice of Appeal from the December 4, 1987 order.

On this appeal, Rate Counsel presents the following issues:

I The Board's adoption of a proposal presented *dehors* the administrative record denied the parties the right to present testimony and to conduct cross examination in violation of the Administrative Procedure Act and procedural due process guarantees.

A.  The Board's Consideration and Adoption of Matters Outside of the Administrative Record Violated *N.J.S.A.* 52:14B–1 *et. seq.*

B   The Board['s] Consideration and Adoption of Factual Matters Submitted Outside of the Administrative Record Violated the Parties' Right to Due Process of Law.

I   The Board's decision to increase base rates to include the Lovett and Rio conversion costs must be reversed because it does not provide "just and reasonable" rates as required by *N.J.S.A.* 48:2–21.

## I

██ Initially, Rate Counsel argues that the Board's Order violated the APA, *N.J.S.A.* 52:14B–1, *et seq.*, because it was not based upon evidence in the record at the hearing and thus it denied the parties their cross-examination and rebuttal rights. In particular, Rate Counsel argues that the Board's adoption of Rockland's "alternate proposal" constituted an adoption of matters outside of the administrative record in violation of the APA and the applicable administrative code sections.  However, the APA does not create a substantive right to a hearing; it merely delineates the procedure to be followed when a hearing is required by statute or constitutional law.  *See e.g., Little Falls Township v. Bardin,* 173 *N.J.Super.* 397, 404–405 (App.Div. 1979), certif. den. 82 *N.J.* 286 (1980); *In re Application of Modern Industrial Waste Service, Inc.,* 153 *N.J.Super.* 232, 237 (App.Div.1977).

Public utility rate-making is governed by *N.J.S.A.* 48:2–21. Pursuant to this statute, "[w]hen any public utility shall *increase* any existing individual rates, joint rates, tolls, charges or schedules thereof ... or change or alter any existing classification, the board ... shall have power after hearing, upon notice, by order in writing to determine whether the increase, change or alteration is just and reasonable." *N.J.S.A.* 48:2–21(d) (emphasis supplied).  When a public utility seeks to decrease rates there is no requirement for a hearing.  *Cf. In re Jersey Central Power & Light Co. Petition,* 85 *N.J.* 520, 528 (1981).

██ In the present case, several portions of Rockland's proposal sought to *decrease* base rates to reflect tax savings

associated with the 1986 Tax Reform Act, pension cost savings associated with the Statement of Financial Accounting Standards No. 87, and a reduction in Rockland's return of equity. Although these proposals were made after the hearing before the ALJ, the Board was not required to hold a hearing before adopting them. Thus the adoption of these portions of Rockland's proposal did not violate the APA.

■ The other portions of Rockland's proposal sought to include the costs of the Rio and Lovett projects in base rates. This proposal required a hearing.[2] Although Rate Counsel argues that the hearing was inadequate, Rate Counsel had notice of this proposal and also had an opportunity to address this issue and cross-examine Rockland's witness in regards to the evidence Rockland presented in support of its argument.

As mentioned above, the APA is also applicable when a hearing is required by constitutional law. *N.J.S.A.* 52:14B–2. As stated in *Cedar Grove v. Sheridan*, 209 *N.J.Super.* 267, 275 (App.Div.1986), two prerequisites must be met in order to establish a constitutional right to a hearing. First, there must be "contested factual issues which may be presented in an evidentiary manner in proceedings which are targeted at a person, group of persons or entity." *Id.* (citations omitted). In addition, "particularized property rights or other special interests" must be at issue. *Id.* (citation omitted). In determining whether a property right exists, state law, which is controlling on whether there is a property interest, must be examined. *Montville Township v. Block 69, Lot 10*, 74 *N.J.* 1, 7 (1977).

■ In the present case, Rate Counsel appears to be arguing that ratepayers have a special interest in having the largest

---

[2]In a footnote on page 35 of its brief, Rate Counsel states that Point II of its brief addresses the issue of whether the Board could properly change base rates in a LEAC proceeding. However, a reading of the brief reveals that this issue was *not* addressed by Rate Counsel; therefore, it will not be addressed here.

rate decrease possible. However, Rate Counsel does not cite any authority to support this proposition, and, as indicated in *N.J.S.A.* 48:2-21(d), rate taxpayers have a special interest only when a rate increase is sought. Although there was no hearing in regards to Rockland's proposal to reduce its rates, neither statutory or constitutional law required a hearing on these issues. Therefore, the Board did not violate the APA by adopting these portions of Rockland's proposal. Since a hearing was required only as to the inclusion of the Rio and Lovett costs in the base rate, and since there was an actual hearing on this issue, we find no merit to Rate Counsel's contention.

■ Nor do we find any violation of procedural or substantive due process of law. Due process requirements "depend[ ] upon what the state or governmental body seeks to take from or deprive a person of receiving." *Gish v. Board of Education of Paramus*, 145 *N.J.Super.* 96, 106 (App.Div.1976), certif. den. 74 *N.J.* 251 (1977), *cert.* den. 434 *U.S.* 879, 98 *S.Ct.* 233, 54 *L.Ed.*2d 160 (1977) (citation and footnote omitted). *See also Chrysler Corp. v. Fedders Corp.*, 670 *F.*2d 1316 (3rd Cir.1982). As discussed above, most of Rockland's proposal dealt with *reducing* rates. Thus the Board's adoption of these portions of the proposal did not constitute a "taking" or "deprivation" of property. Although the inclusion of the Rio and Lovett costs might arguably constitute a "taking" or "deprivation," this issue was addressed at the hearing before the ALJ. Thus, the Board's adoption of Rockland's proposal did not violate Rate Counsel's right to due process.

## II

■ Rate Counsel next contends that the Board's decision to increase base rates to include the Lovett and Rio conversion costs must be reversed because it does not provide "just and reasonable" rates as required by *N.J.S.A.* 48:2-21. Pursuant to *N.J.S.A.* 48:2-21(b)(1), the Board has the power to "[f]ix just and reasonable individual rates, joint rates, tolls, charges or

schedules thereof." In the present case, Rate Counsel argues that the "Board's conduct ... cannot satisfy the 'just and reasonable' requirement" because it accepted Rockland's books at face value, in violation of the Supreme Court's holding in *Public Service Coordinated Transport v. State*, 5 *N.J.* 196, 217–218 (1950). In addition, Rate Counsel argues that the Board "has egregiously violated the most fundamental requirements of ratemaking by attempting to increase base rates without analyzing the components of utility rates and without holding Rockland to its statutory burden" of proving that the rate increase it sought was just and reasonable.

A reading of the Board's order and decision refutes Rate Counsel's contention. Although the Board determined that "the base rate effect of Lovett Plant Four and Lovett Plant Five as well as the Rio reconstruction be reflected when the final Lovett Plant becomes operational," it did not specify what the base rate effect would be. The last paragraph of the Board's order instructed the Board's staff to "monitor and review prior to the next LEAC proceeding or base rate petition of [Rockland] the costs related to the Lovett and Rio projects." We find that the Board did not merely accept Rockland's books at face value—the order anticipated reviewing the costs at a future point in time. Thus, Rate Counsel has failed to show that the Board's decision was not "just and reasonable."

### III

In *In re Jersey Central Power & Light Co.*, 85 *N.J.* 520 (1981), the Supreme Court recognized that the Board's policy determinations which result in rate adjustments that shift rate components but do not result in rate increases to the consumer need not be the subject of adversarial hearing. There, the Court upheld a Board's decision which offset costs associated with the removal of the then idle TMI–I plant from Jersey Centra's rate base by an acceleration of recovery of certain energy costs. The acceleration of energy cost recovery was the

result of the Board's deliberation subsequent to the public rate hearing. The Board's action resulted in no actual rate increase to the consumer. There, as here, Rate Counsel challenged the acceleration of the third energy cost recovery on the ground that standing alone, such acceleration constituted a rate increase.

With respect to the alleged "rate increase" and "right to a hearing," Rate Counsel raised, and the Supreme Court rejected, the same arguments presented here. 85 *N.J.* at 527. The Supreme Court concluded

> that neither procedural due process nor the APA required the Board to provide particularized notice of its specific intention to make a policy determination with respect to accelerated amortization of the deferred energy balance. [85 *N.J.* at 528.]

The Court noted that, as in the present instance, Rate Counsel had not demonstrated any prejudice nor made any proffer of "noteworthy evidence that would have been introduced had [Rate Counsel] received more detailed notice of the Board's proposed action." 85 *N.J.* at 528.

In the present case, Rate Counsel was given ample opportunity to address issues of concern to it, such a the inclusion of carrying costs associated with the Rio and Lovett plant modifications. In *Jersey Central,* the Board's action was described as "innovative." 85 *N.J.* at 532. Here, precedent exists for the Rio and Lovett inclusions. *See In re Jersey Central Power & Light,* BPU Docket No. 807–461; *In re Atlantic City Electric Company,* BPU Docket No. 7911–951 (1982).

██ In the present case, the Board very clearly articulated the policy considerations which led it to include the Rio and Lovett costs in Rockland's LEAC computation. It noted Rockland's contention that passing on fuel cost reductions resulting from the Rio and Lovett reconstruction without reflecting the carrying costs associated with the projects would send "confusing price signals to consumers since rates may be reduced during the first part of the year and subsequently increased during the latter part of the year if the Company is forced to

file a base rate case." With regard to the importance of encouraging the type of reconstruction efforts involved in the Rio and Lovett projects the Board stated:

> In the early 1970's ... [a]t a time when this country set a national policy to become self-dependent on fuel sources, many utilities, including Rockland Electric *as encouraged by the Board*, began a fuel source diversification plan. By 1986 Rockland Electric generated 50% of its electricity from gas. The conversion of Lovett to a facility which can burn oil or gas or coal, whichever energy has the lowest price at any given time, helps the Company achieve their policy of providing ratepayers with the lowest cost energy.
>
> The Board definitely believes that these carrying costs should be included in the base rate through this LEAC proceeding, *since these projects were carried out in the public interest at the urging of the Board.* This action by the Board insures adequate rate stability to the ratepayers. [Emphasis supplied.]

On the issue of public opportunity to address the Rio and Lovett inclusions, it was stated:

> The Board after an extensive review of these proceedings is satisfied that the consumer was afforded sufficient public notice as well as a public hearing....
> There was full participation in these proceedings held before the Office of Administrative Law by the Public Advocate and [the] Board's Staff, and thus [sic] insures full protection to the ratepayer as well as providing a system of checks and balances that has resulted in a fair and equitable process to all parties.

Finally, as to Rate Counsel's objections with respect to LEAC adjustments made necessary by changes in federal tax law, such adjustments, although included in the instant Board order, are in reality the implementation of a generic Board order directed at all utilities under the Board's jurisdiction. *In the Matter of the Board's Consideration of the Federal Tax Reform Act of 1986,* BPU Docket No. AX 36121392, decided January 6, 1987. Again, as with other aspects of the Board's order, implementation of this tax adjustment resulted in a decrease in the utility's return. Rate Counsel was free to, but did not, appeal the Board's generic tax order.

In the present case, the Board has achieved an appropriate balance between competing consumer and utility interests, specifically, the consumer's interest in the lowest fuel costs possible and the utility's interest in prompt rate recognition of its fuel saving efforts. Such a balance requires the fullest exer-

cise of administrative expertise and discretion. In such circumstances, there exists no reason for this Court to accord the determination herein anything less than the traditional presumption of correctness which attaches to Board orders. *See New Jersey Bell Telephone Company v. Board of Public Utility Commissioners*, 12 *N.J.* 568, 590 (1953); *Township Committee of Lakewood Township v. Lakewood Water Company*, 54 *N.J.Super.* 371, 382 (App.Div.1959).

Affirmed.