708 A.2d 775

IN THE MATTER OF THE PETITION OF ATLANTIC CITY
ELECTRIC COMPANY FOR A FINAL INCREASE IN
ITS ENERGY ADJUSTMENT CHARGE.

Superior Court of New Jersey
Appellate Division

Argued March 31, 1998—Decided May 1, 1998.

---

Before Judges KEEFE and PAUL G. LEVY.

*John R. Armstrong,* argued the cause for appellant Rate Intervention Steering Committee (*Cooper Perskie April Niedelman Wagenheim & Levenson,* attorneys; *Christine M. Cote,* on the brief).

*Joseph Quirolo,* Deputy Attorney General, argued the cause for respondent New Jersey Board of Public Utilities (*Peter Verniero,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Helene S. Wallenstein* and *Elise Goldblat,* Senior Deputy Attorneys General and *Mr. Quirolo,* on the brief).

*Mark L. Mucci,* argued the cause for respondent Atlantic City Electric Company (*LeBoeuf, Lamb, Greene & MacRae,* attorneys; *Stephen B. Genzer* and *Mr. Mucci,* on the brief).

The opinion of the court was delivered by

PAUL G. LEVY, J.A.D.

A group of county utility authorities, townships, and private entities, denominated the Rate Intervention Steering Committee

(RISC), appeals from a final decision of the New Jersey Board of Public Utilities (BPU) approving a rate increase sought by the Atlantic City Electric Company. In doing so, RISC alleges the BPU: (1) incorrectly applied federal caselaw in reaching its decision; (2) arbitrarily concluded that the increase was warranted; (3) erroneously concluded that Atlantic City Electric did not have "excess capacity," the costs for which the electric company should not be able to recover; and (4) failed to provide adequate notice or opportunity to comment when approving contracts between the electric company and other producers of electricity from whom the electric company purchased power.

■ We agree with Administrative Law Judge (ALJ) Gural and the BPU and hold that after the BPU approved a contract for the Atlantic City Electric Company to buy energy at regulated costs, federal law preempted the BPU's reconsideration due to a reduction of market rates to levels below the original contract rates.

Contracts of Atlantic City Electric to buy electric energy were governed by the rules of the Federal Energy Regulatory Commission (FERC), pursuant to 16 *U.S.C.A.* §§ 791–828c (the Public Utility Regulatory Policies Act of 1978, also referred to as PURPA). PURPA was part of a comprehensive effort to combat a national energy crisis, and was intended to reduce the country's reliance on oil and gas by increasing the use of more abundant, domestically produced fuels. Hence, PURPA requires that FERC adopt rules requiring public utilities to buy electric energy from qualified cogeneration facilities (QF), also known as non-utility generators of power (NUG). *Freehold Cogeneration Assocs., L.P. v. Board of Regulatory Commissioners of New Jersey*, 44 *F.*3d 1178, 1182 (3d Cir.), *cert. denied*, 516 *U.S.* 815, 116 *S.Ct.* 68, 133 *L.Ed.*2d 29 (1995); 16 *U.S.C.A.* § 824a–3(a).[1]

---

[1] Notably, in 1978, when PURPA was enacted, there was little nonutility power generation. By 1995, as the result of PURPA, NUGs provided over one-half of all new generation resources. *Southern Calif. Edison Co.*, 70 *FERC* ¶ 61,215, 1995 WL 143085 (February 23, 1995).

The rules adopted by FERC must insure that the rates an electric utility pays a NUG to purchase energy shall be "just and reasonable to the electric consumers of the electric utility and in the public interest." 16 *U.S.C.A.* § 824a–3(b). Moreover, no such rule may provide for a rate which exceeds the "incremental cost to the electric utility of alternative electric energy." *Ibid.* The phrase "incremental cost of alternative electric energy" is defined as "the cost to the electric utility of the electric energy which, but for the purchase from [a NUG], such utility would generate or purchase from another source." 16 *U.S.C.A.* § 824a–3(d). Another term for the phrase "incremental cost of alternative electric energy" is the electric utility's "avoided cost," defined as the cost the utility would have incurred had it generated the electricity itself or purchased it from another source. *American Paper Institute v. American Elec. Power Svc. Corp.*, 461 *U.S.* 402, 404, 103 *S.Ct.* 1921, 1923, 76 *L.Ed.*2d 22, 27 (1983); *Freehold Cogeneration, supra,* 44 *F.*3d at 1183. In sum, PURPA requires that utilities purchase energy from NUGs at a rate equal to or less than a utility's avoided cost. *American Paper Institute, supra,* 461 *U.S.* at 406, 103 *S.Ct.* at 1924, 76 *L.Ed.*2d at 28.

The rules require that "standard rates" be established for purchases of electric power from NUG's. 18 *C.F.R.* § 292.304(c)(1). Further, each NUG may provide energy to a purchasing utility pursuant to a legally enforceable agreement for the delivery of energy over a specified term. 18 *C.F.R.* § 292.304(d)(2). The rates charged by the NUG for that energy shall be based on either the "avoided cost calculated at the time of delivery," or on the "avoided cost calculated at the time the obligation is incurred." 18 *C.F.R.* § 292.304(d)(2)(i) and (ii).

Pursuant to PURPA, the BPU set out to establish standard rates for the purchase by utilities of electric energy from NUG's. Specifically, on May 12, 1981, the BPU conducted a hearing to receive public comment on the issue. The BPU also requested electric utilities to provide data regarding their avoided costs. On October 14, 1981, the BPU issued an order establishing a method-

ology for the calculation of the avoided costs a utility would incur by purchasing energy from a NUG. That methodology involved using the Pennsylvania–New Jersey–Maryland (PJM)[2] billing rate, plus ten percent, to determine avoided energy costs, and the PJM capacity deficiency rate to determine avoided capacity costs. This avoided cost methodology was referred to as the standard pricing methodology. There were no appeals from the BPU's order establishing the standard pricing methodology. In December 1983, the BPU issued another order reaffirming the October 1981 order. No appeal was taken from that order either.

In New Jersey, utilities generally increase their rates through base rate proceedings initiated by the filing of a petition. However, electric utilities such as Atlantic City Electric may also seek an annual increase in their rates by petitioning for a modification of their "fuel adjustment clause," also known as a "levelized energy adjustment clause," or "LEAC." *Application of Rockland Elec. Co.*, 231 *N.J.Super.* 478, 483–84, 555 *A.*2d 1140 (App.Div.), *certif. denied*, 117 *N.J.* 129, 564 *A.*2d 855 (1989). The LEAC is defined in the regulations cited above as "the mechanism employed by electric utilities whereby a charge or credit is made when the estimated average cost of energy produced, purchased or interchanged for the applicable period is above or below the base cost of energy." *N.J.A.C.* 14:3–13.2. Thus, a LEAC is a:

> widely used and judicially accepted rate-making mechanism used to recover certain components of fuel costs incurred by a utility. Originating during the energy crisis of the 1970's, energy adjustment clauses are designed to permit a utility to include in rates initial estimates as to future fuel costs and to make subsequent periodic adjustments to reflect actual costs when ascertained.
>
> [*Application of Rockland, supra,* 231 *N.J.Super.* at 484, 555 *A.*2d 1140].

In sum, a constant LEAC charge is included in a utility's overall rate tariff "based on estimated prospective 12–month energy costs. This charge is subject to periodic adjustment to reflect actual

---

[2] PJM refers to the Pennsylvania–New Jersey–Maryland interconnection, a pooled power cooperative used by utilities in those three states.

costs." *In re Petition of Jersey Central Power & Light Co.*, 85 *N.J.* 520, 524, 428 *A.*2d 498 (1981).

In 1987, when Atlantic City Electric sought approval of its proposed agreements with several NUGs, a settlement required Atlantic City Electric to use an agreed standard pricing methodology to set prices when it contracted with a NUG. In 1988, another BPU settlement grandfathered Atlantic City Electric's NUG contracts, and those contracts did not require re-negotiation until seven years later in 1995, when Atlantic City Electric filed a LEAC petition for the period from June 1, 1995 to May 31, 1996.

RISC opposed the petition, contending that the NUG contracts approved in the 1980s were based on projected energy costs, but those projections proved to be inaccurate in that they were higher than the actual current costs. Thus, it argued that the BPU should reject any recovery by Atlantic City Electric of the contract costs associated with buying energy. RISC asserted that the NUG contracts should be voided, since that would save ratepayers money, regardless of the impact on Atlantic City Electric or the NUGs.

ALJ Gural sustained the proposed LEAC increase for Atlantic City Electric. He rejected the opposition proposal to void the NUG contracts, based on *Freehold* and a FERC decision, *New York State Electric and Gas Corp.*, 71 *FERC* ¶ 61,027, 1995 WL 216781 (April 12, 1995). Those cases held that once a state BPU approved a NUG contract with costs consistent with avoided costs, any action by the BPU to reconsider approval of the contracts or deny the pass-through of these costs was preempted by federal law. Additionally, the opposition had not provided sufficient notice to the NUGs and they had no chance to participate in the proceeding where their very existence was being challenged. The BPU affirmed ALJ Gural, and we, in turn, affirm the BPU, based on the substantial evidence in the record and the logic of the *Freehold* and *New York State Electric and Gas Corp.* cases.

The preemption issue was created by 16 *U.S.C.A.* § 824a–3(e)(1), which provides in pertinent part that:

[T]he Commission shall, after consultation with representatives of State regulatory authorities, electric utilities, owners of cogeneration facilities and owners of small power production facilities . . . prescribe rules under which geothermal small power production facilities of not more than 80 megawatts capacity, *qualifying cogeneration facilities* and qualifying small power production facilities *are exempted in whole or part from the Federal Power Act . . . from the Public Utility Holding Company Act . . . from State laws and regulations respecting the rates, or respecting the final or organizational regulation, of electric utilities, or from any combination of the foregoing, if the Commission determines such exemption is necessary to encourage cogeneration and small power production.*

[Emphasis added].

FERC regulations similarly provided that any NUG shall be exempted from state law or regulation respecting the rates of electric utilities. 18 *C.F.R.* § 292.602(c).

In *Freehold, supra,* a NUG, Freehold Cogeneration Associates, entered into a contract with Jersey Central Power and Light. The agreement between the two entities was approved by the BPU (then the Board of Regulatory Commissioners). 44 *F.*3d at 1182. In that order, the Board committed itself and its successors to allowing Jersey Central to pass through those NUG costs and to recover them. *Id.* at 1193 n. 13.

However, as the cost of obtaining electric power decreased, Jersey Central sought to buy out the contract; the NUG rebuffed those efforts. The BPU ordered the parties to renegotiate their power purchase agreement, or alternatively to negotiate a buy-out. If no agreement was reached within thirty days, the BPU would conduct hearings to determine how to proceed. Freehold then sued, seeking a declaratory judgment that the BPU was preempted by PURPA from requiring it to renegotiate its contract with Jersey Central. *Id.* at 1183.

In addressing the issue, the Third Circuit accepted Freehold's argument that any attempt to revisit a previously approved NUG contract as a result of changed circumstances deprived the NUG of the "benefits of the bargain." *Id.* at 1193. The court held that:

[O]nce the BRC approved the power purchase agreement between Freehold and [Jersey Central] on the ground that the rates were consistent with avoided cost, any action or order by the BRC to reconsider its approval or to deny the passage

of those rates to [Jersey Central's] consumers under purported state authority was preempted by federal law.

[*Id.* at 1194.]

FERC has also ruled that the pass through of NUG contract costs to ratepayers should not be subject to subsequent disapproval if the contracts were not challenged when approved. *See New York State Electric and Gas Corp., supra,* 71 *FERC* ¶ 61027, 1995 WL 216781. Specifically, FERC noted that "we will not disturb existing [NUG] contracts containing such purchase rates if the contracts were not challenged at the time they were signed and are not now the subject of an ongoing challenge to the State's avoided cost determination." FERC also denied that petition because it had a policy against "invalidating contracts for which a PURPA-based challenge was not raised timely and is still not pending." Rather, the appropriate time to challenge a NUG contract is "up to the time the contract is signed, not years into a contract." Finally, FERC recognized the NUG's correct belief that once the deadline for challenging a NUG contract had passed, the contracts with electric utilities were binding, and the NUG could therefore have reasonable expectations of recovering the cost of providing its electricity. *See also Metropolitan Edison Company and Pennsylvania Electric Co.,* 72 *FERC* ¶ 61,015, 1995 WL 397198 (July 6, 1995), *reconsideration denied,* 72 *FERC* ¶ 61269, 1995 WL 556525 (September 20, 1995); *West Penn Power Company,* 71 *FERC* ¶ 61,153, 1995 WL 265343 (May 8, 1995); *Southern Calif. Edison Company, supra,* 70 *FERC* ¶ 61,215, 1995 WL 143085.

■ Therefore, the precise argument raised by RISC here has been rejected by both FERC and the Court of Appeals for the Third Circuit. That is, once a NUG contract is executed and the NUG is operating under the contract, neither FERC nor the courts will retroactively invalidate the contract simply because energy costs to the utility become lower in the market than they are under the contract. As did those tribunals, we hold that once a NUG contract is executed and becomes operational, there can be no retroactive invalidation of the contract just because energy rates in the market fall below the contract rates. We reject RISC's attempt to distinguish its situation from the cited cases by

arguing that procedural infirmities existed in the BPU action. Instead, we find that the BPU substantially followed the procedures of PURPA, and these challenges by RISC are without merit. *R.* 2:11–3(e)(1)(D) and (E). Since the BPU orders of the 1980s were never challenged, we will not allow a collateral attack at this late date.

By affirming the BPU on the basis of federal preemption, we need not address the other claims raised by RISC.

Affirmed.