**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3621-18

IN THE MATTER OF THE
ADOPTED AMENDMENT TO
N.J.A.C. 14:1-5.12 (TARIFF
FILINGS OR PETITIONS
WHICH PROPOSE INCREASES
IN CHARGES TO CUSTOMERS).

_____

Argued March 10, 2021 – Decided June 7, 2021

Before Judges Whipple, Rose and Firko.

On appeal from the New Jersey Board of Public Utilities, Docket No. AX17111144.

Christine M. Juarez, Assistant Deputy Rate Counsel, argued the cause for appellant New Jersey Division of Rate Counsel (Stefanie A. Brand, Director, attorney; Stefanie A. Brand, of counsel and on the briefs; Brian O. Lipman, Litigation Manager, Christine M. Juarez, and Maura Caroselli, Assistant Deputy Rate Counsel, on the briefs).

Steven S. Goldenberg argued the cause for appellant New Jersey Large Energy Users Coalition (Giordano, Halleran & Ciesla, PC, attorneys; Steven S. Goldenberg, of counsel and on the brief).

Paul M. Youchak, Deputy Attorney General, argued the cause for respondent New Jersey Board of Public Utilities (Gurbir S. Grewal, Attorney General, attorney; Sookie Bae, Assistant Attorney General, of counsel; Patricia A. Krogman, Deputy Attorney General, on the brief).

Gregory Eisenstark argued the cause for respondent Jersey Central Power & Light Company (Cozen O'Connor, PC, attorneys; Gregory Eisenstark, Michael Connolly and Amorie Hummel, on the brief).

Mark A. Lazaroff argued the cause for respondent Atlantic City Electric Company (Morgan, Lewis & Bockius, LLP, attorneys; Terry D. Johnson and Mark A. Lazaroff, on the brief).

James C. Meyer argued the cause for respondent New Jersey Utilities Association (Riker Danzig Scherer Hyland & Perretti, attorneys; James C. Meyer and Diane N. Hickey, on the brief).

Andrew K. Dembia, attorney for respondent New Jersey Natural Gas Company, joins in the brief of respondent New Jersey Utilities Association.

Matthew M. Weissman, attorney for respondent Public Service Electric and Gas Company, joins in the brief of respondent New Jersey Utilities Association.

Cullen and Dykman, PC, attorneys for respondent New Jersey-American Water Company, Inc. (Bruce V. Miller, of counsel and on the brief).

Saul Ewing Arnstein & Lehr, LLP, attorneys for respondent SUEZ Water Company, Inc., (Stephen B. Genzer, on the brief).

A-3621-18

Szaferman, Lakind, Blumstein & Blader, PC, attorneys for amicus curiae American Association of Retired Persons (Janine G. Bauer, on the brief).

PER CURIAM

This is the second appeal by the Division of Rate Counsel of the modification by the New Jersey Board of Public Utilities (Board) of N.J.A.C. 14:1-15.12 regarding the consolidated tax adjustment (CTA) rule. Traditionally, when a public utility was affiliated with other nonregulated companies, its revenue and expenses were kept separate from the affiliates. It was considered sound regulatory policy not to comingle the income and expenses of a public utility with its nonregulated affiliates. Changes in federal tax laws allowed unregulated utility holding companies to file one consolidated federal income tax return. And New Jersey has permitted the practice and has applied the CTA to share realized tax benefits with ratepayers.

The Board has applied a CTA in utility rate cases for several decades, and our courts have confirmed that the Board has "the power and the function to take into consideration the tax savings flowing from the filing of the consolidated return and determining what proportion of the consolidated tax is reasonably attributable to [the utility]." Lambertville Water Co. v. N.J. Bd. of Pub. Util. Comm'rs, 153 N.J. Super. 24, 28 (App. Div. 1977). The Board has

used various methodologies to determine and apply a CTA in utility rate cases. The most recent methodology is known as the Rockland methodology. In re Verified Petition of Rockland Elec. Co. for Approval of Changes in Elec. Rates, Its Tariff for Elec. Serv., Its Depreciation Rates, & for Other Relief, BPU Docket No. ER02100724 (April 20, 2004) (slip op. at 22-27).

In 2013, the Board decided to review the CTA because of changes in federal income tax laws and utilities' corporate structures since the Rockland methodology was implemented, In re Bd.'s Review of the Applicability & Calculation of a Consol. Tax Adjustment, BPU Docket No. EO12121072 (January 23, 2013) (slip op. at 1), which was initiated through a generic proceeding.

In the prior appeal, we addressed the Board's modification of N.J.A.C. 14:1-15.12 through a procedural lens after the generic proceeding and held that a generic proceeding was inadequate for agency action that amounted to rulemaking. In the case of In re Bd.'s Review of Applicability & Calculation of Consol. Tax Adjustment, No. A-1153-14 (App. Div. Sept. 18, 2017) (slip op. at 1-2), we reversed the Board's order, holding that the modifications were of sufficient significance and generality to require a rulemaking proceeding pursuant to the Administrative Procedure Act, N.J.S.A. 52:14B-1 to -15 (the

4

Act), and thereafter, the Board conducted one. The Board promulgated N.J.A.C. 14:1-15.12 with the same modifications.

Rate Counsel now appeals, and we granted the New Jersey Large Energy Users Coalition (NJLEUC) leave to appear as a co-appellant. Other respondents filed briefs, including Atlantic City Electric Company (ACE), Jersey Central Power & Light Company (JCP&L), New Jersey-American Water Company, Inc. (NJAW), New Jersey Utilities Association, and SUEZ Water Company Inc. (SUEZ). The American Association of Retired Persons (AARP) appeared as amicus curiae.

The co-appellants argue the new rule has three substantive errors, each error justifies reversal, and it must be reversed due to the Board's failure to satisfy the Act's procedural requirements for rulemaking. Having reviewed the record, we reverse and remand.

I.

As we explained in In re Bd.'s Review of Applicability & Calculation of Consol. Tax Adjustment, No. A-1153-14 (App. Div. Sept. 18, 2017) (slip op. at 1), under the Rockland methodology, calculation of the CTA first requires a determination of the net taxable gains. The Rockland methodology was developed in a series of rate cases culminating in In re Verified Petition of

Rockland Elec. Co., (slip op. at 62-64); see also In re Petition of Jersey Cent. Power & Light Co., BRC Docket No. ER91121820J (June 15, 1993) (slip op. at 8); In re Petition of Atlantic City Elec. Co., BRC Docket No. ER90091090J (Oct. 20, 1992) (slip op. at 6). The Rockland methodology permitted losses of all the companies on the consolidated federal tax return for each year during a review period, which began in 1991 and ends in the most recent tax year.

The companies that experienced net taxable gains are grouped together, and their net taxable gains are aggregated. The companies that experienced net taxable losses are grouped together and their net taxable losses are aggregated. The aggregated losses are then multiplied by the applicable federal income tax rate to determine the group's consolidated tax benefit. The amount of the consolidated tax benefit is then allocated proportionately to the companies that experienced net taxable gains based on their proportionate share of the total aggregated gains. If application of the Rockland methodology establishes that a New Jersey utility experienced net taxable gains during the review period, its proportionate share of the consolidated tax benefit constitutes its CTA. The amount of the CTA affects the utility's rate base because the larger the tax savings adjustment under the CTA, the greater the reduction in the utility's rate base.

6

The CTA does not result in a dollar-for-dollar reduction in the utility's tax expenses that are used to calculate the rate base. The CTA tax savings are treated as a loan from ratepayers, whose payments contributed to the profits that would otherwise have been taxed if not for the consolidated filing. Jersey Cent. Power & Light Co., slip op at 8. The parent company gains use of those profits earlier than it otherwise would have, and the CTA, in turn, compensates ratepayers for the time-value of their money by adjusting the company's rate base in an amount intended to prospectively credit ratepayers for the carrying costs of the loan. Petition of Atlantic City Elec. Co., slip op. at 6.

On December 19, 2017, the Board held an "agenda meeting" and voted to publish its new CTA policy in the New Jersey Register as a rule proposal to amend N.J.A.C. 14:1-5.12, and to publish notice of a sixty-day period for public comment.

The rule proposal and the notice were published on January 16, 2018. 50 N.J.R. 281(a).[1]

_____

[1] The proposal misstated the allocation of twenty-five percent of the CTA to ratepayers as a reduction to "the rate base adjustment" instead of as a reduction to just "the rate base":

> The amendment adjusts the scope of a CTA analysis
> by: (1) requiring that it shall be for five consecutive
> tax years including the complete tax year within the

utility's proposed test year; (2) the calculated CTA shall be allocated so that the rate base adjustment may be reduced by up to [twenty-five] percent of the full CTA; and (3) the transmission portion of an electric distribution company's income shall not be included in the calculation of CTA.

On February 5, 2018, the Board corrected the misstatement by publishing a corrected notice and extending the comment period.  50 N.J.R. 709(a).  The corrected proposal stated:

> If a company is part of a family of companies that files a consolidated Federal income tax return, that company shall include in its petition a (CTA) calculation using the rate base method, which allows the parent company to keep certain tax savings, while requiring the petitioner to reflect the savings by reducing the rate base upon which the utility's return is determined.  The CTA calculation must include all supporting information and documents necessary for the Board to determine and implement an appropriate CTA calculation pursuant to this section.  A CTA provides a mechanism that the Board will utilize in rate cases, so that ratepayers should share a specified portion of the tax savings achieved from the filing of a consolidated tax return.  Required information and supporting documents include, but are not limited to, a schedule showing each affiliate company's taxable income/loss by year, an indication whether the affiliate is a regulated utility company or not, the statutory Federal income tax requirement for each year, if any, and the alternative minimum tax requirement for each year, if any.  The review period for the CTA calculation shall be for five consecutive tax years, including the complete tax year within the utility's proposed test year.  The calculated CTA shall be allocated, so that the rate base may be reduced by

8

A-3621-18

The corrected notice included the Board's impact analysis statements, which were unchanged from the January 2018 notice.

The Board again requested comments, which the parties submitted in March 2018. On January 17, 2019, at an agenda meeting, the Board accepted the staff recommendation to adopt the rule proposal as published on February 5, 2018. On March 18, 2019, it published notice of its adoption of the new rule at 51 N.J.R. 414(d).[2] This appeal followed.

## II.

On appeal, Rate Counsel argues that the Board committed reversible error by allocating only a fraction of the CTA to ratepayers. It argues that the allocation of seventy-five percent to shareholders and only twenty-five percent

---

> up to [twenty-five] percent of the full CTA. The transmission portion of an electric distribution company's income shall not be included in the calculation of CTA.
>
> [50 N.J.R. 709(a) (emphasis added).]

[2] The published notice of rule adoption summarized forty-nine comments and set forth the Board's first published statement of its responses. To the comments opposing any modification of the CTA, or conversely urging its abolition, the Board responded that "[i]t is both just and reasonable that an unregulated parent company that derives a tax benefit from a consolidated tax filing resulting from the inclusion of subsidiaries whose revenues come from New Jersey ratepayers, should share those benefits with those same ratepayers." 51 N.J.R. 414(d) (response to cmt. 5).

to ratepayers was reversible for being arbitrary and capricious because it did not reflect any evidence in the record and because the Board gave no explanation of how it reached that result or why it should be considered fair and reasonable.

Rate Counsel further argues that shareholders must "share the benefits of consolidated tax savings with the ratepayers," to avoid rates that are unjust or unreasonable for covering a utility's nominal rather than actual expenses. However, given the mandate against imposing any "hypothetical income taxes" on ratepayers, denying them even a portion of the CTA must be shown to be necessary, and there was no such showing here.

NJLEUC and AARP make similar arguments, adding that the allocation was arbitrary because the Board did not show the manner in which the new rule would alleviate the supposed hindrances that the prior CTA posed to particular goals such as fostering adequate investment.

The Board (as well as respondents ACE and JCP&L[3]) assert the rule it promulgated to allocate the CTA between ratepayers and shareholders was

_____

[3] JCP&L makes the further argument that Rate Counsel is estopped from appealing the CTA rule due to Rate Counsel's acquiescence to the same CTA methodology while participating in a prior rate base case that was fully litigated. JCP&L does not assert that NJLEUC is so estopped, or that Rate Counsel's absence from this appeal would prevent NJLEUC from maintaining

10

well within its broad grant of authority to regulate public utilities and was a proper exercise of its discretion, and that the prior methodology yielded results that were unworkably variable and sometimes anomalous. These respondents also argue that the record justified the new rule as an application of the Board's expertise in construing abstruse tax regimes and corporate tax structures and in relating them to ratemaking policies in the public interest. The allocation recognized that tax savings required a consolidated group to have members outside the Board's jurisdiction with operating losses, as well as members like the utilities within its jurisdiction with taxable operating income, and the allocation also recognized the contributions of all members to the group's ability to recognize the tax savings and encouraged investment. Finally, the Board argues that rates are set only in rate base proceedings, for one utility at a time, and that the CTA is not a rate, but rather just one element in the determination of rates.

NJAW makes similar arguments to support its position that the Rockland CTA methodology had become "confiscatory." It argues the Rockland CTA compelled the judicious compromise that the Board promulgated, which emphasized the need to restore the CTA to the modest dimensions that it had

it or from advancing any particular arguments. We consider this argument unavailing.

when the methodology was first developed and that it was expected to maintain. SUEZ's arguments are in accord.

## III.

"In light of the executive function of administrative agencies, the judicial capacity to review administrative actions is severely limited." In re Petitions for Rulemaking, N.J.A.C. 10:82-1.2 & 10:85-4.1, 117 N.J. 311, 325 (1989). "Courts can intervene only in those rare circumstances in which it is clear that the agency action is inconsistent with its mandate." Ibid.

> Although sometimes phrased in terms of a search for arbitrary or unreasonable agency action, the judicial role is restricted to three inquiries: (1) whether the agency's action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors.
>
> [Ibid.]

We have explained that a "'strong presumption of reasonableness' must be accorded the agency's exercise of its statutorily delegated duties," In re Certificate of Need of the Visiting Nurse Ass'n of Sussex Cty., 302 N.J. Super. 85, 95 (App. Div. 1997) (quoting City of Newark v. Nat. Res. Council, 82 N.J.

12

530, 539 (1980)), and that the presumption "is even stronger when the agency has delegated discretion to determine the technical and special procedures to accomplish its task." Ibid. (citing City of Newark, 82 N.J. at 540). An agency's action may therefore only be reversed if the challenger can "demonstrate that the action was arbitrary, capricious or contrary to a legislative purpose." Id. at 94 (quoting Med. Soc'y of N.J. v. Dep't of Law & Pub. Safety, 120 N.J. 18, 25 (1990)). The court must avoid substituting its own judgment about "the wisdom of a particular agency action . . . ." Ibid. (citing N.J. Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562-53 (1978)).

The statute that governs the determination of utility rates, N.J.S.A. 48:2-21(b), requires the Board to set "just and reasonable individual rates" if it determines that any "existing rate [is] unjust, unreasonable, insufficient or unjustly discriminatory or preferential." Petition of Pub. Serv. Coordinated Transp. v. State, 5 N.J. 196, 215 (1950) (quoting N.J.S.A. 48:2-21(b)(1)).

We have jurisdiction "to review any order of the [B]oard and to set aside such order in whole or in part when it clearly appears that there was no evidence before the [B]oard to support the same reasonably or that the same was without the jurisdiction of the [B]oard." N.J.S.A. 48:2-46. However,

"[n]o order shall be set aside in whole or in part for any irregularity or informality in the proceedings of the [B]oard unless the irregularity or informality tends to defeat or impair the substantial right or interest of the appellant." Ibid.

"It is well recognized that rate making is a legislative and not a judicial function, and that the Board . . . , to which the Legislature has delegated its rate making power, is vested with broad discretion in the exercise of that authority." Pub. Serv. Coordinated Transp., 5 N.J. at 214. A court that is reviewing a Board order to change rates must therefore determine whether the old rate was "unjust and unreasonable" and whether the new rate is "just and reasonable." Id. at 216 (citation omitted). That, in turn, requires an evaluation of the regulated utility's rate base, its expenses, "including income taxes and an allowance for depreciation," and the rate of return derived by "relating its income to the rate base." Ibid. "[I]t is axiomatic that if any one of the three is not reasonably supported by the proofs, the rate of fare itself is unreasonable." Ibid.

In making that evaluation, we are mindful that the Board is not bound by "any single formula or combination of formulae," and that the Board's determinations "should reflect the reasonable judgment of the Board based

upon all the relevant facts." Id. at 217. The question is "whether the issue of reasonableness has been properly considered and decided," and there is "a presumption in favor of the validity" of the Board's action because the Board's "exercise of the rate-making power involves a broad measure of legislative discretion." In re N.J. Power & Light Co., 9 N.J. at 498, 508 (1952). However, "this is not a 'strong' or 'conclusive' presumption," and it must be validated by "[r]easonable support in the evidence." Id. at 509.

Our Court has more recently elaborated that ratemaking gives a utility the burden of proving "(1) the value of its property or the rate base, (2) the amount of its expenses, including operations, income taxes, and depreciation, and (3) a fair rate of return to investors." In re Petition of N.J. Am. Water Co., 169 N.J. 181, 188 (2001). Operating expenses must be "actual operating expenses," not "hypothetical expenses which did not and foreseeably will not occur." N.J. Power & Light, 9 N.J. at 528.

In New Jersey Power & Light, there was no dispute about the calculated value of the federal income tax savings that the utility realized from filing as part of a consolidated group. Ibid. The dispute was over the Board's decision to allocate only half of that benefit to the utility on the ground that "it seems

15

equitable" to allocate half of it to the ratepayers.  Ibid.  The Court believed that

the Board erred by allocating any portion to the utility:

> [T]he [u]tility is allowed a deduction from gross
> income for [a]ctual operating expenses only (or actual
> normalized operating expenses), and not for
> hypothetical expenses which did not and forseeably
> [sic] will not occur.  Thus it is entitled to an allowance
> for actual taxes and not for higher taxes that it would
> pay if it filed on a different basis.
>
> [Ibid. (emphasis added.)]

Nonetheless, due to the "fairness of the rate of return" and the "apparent

satisfaction of the public with the existing rates," along with "the rising tax

level now being experienced," the Court found "no reason in this case" to

reverse the Board's order or to modify the rates in it.  Id. at 529.

We have upheld the ratemaking principle that "[i]t is only the real tax

figure which should control rather than that which is purely hypothetical."  In

re Revision of Rates Filed by Lambertville Water Co. v. N.J. Bd. of Pub. Util.

Comm'rs, 153 N.J. Super. 24, 28 (App. Div. 1977).  The Board has "the power

and function to take into consideration the tax savings flowing from the filing

of the consolidated return and determining what proportion of the consolidated

tax is reasonably attributable to" the utility.  Ibid.  If the Board finds that a

regulated utility realized tax savings from reporting as a member of

consolidated group, "the utility consumers are entitled to have the computation of those benefits reflected in their utility rates."  Ibid.

Later we recognized that the determination of which group members to include in the calculation of a utility's "real" tax expense was not obvious, because it would be rational to include all members, or to include only the regulated members, or to apply the "hybrid approach" used in a federal case. In re Revision of Rates Filed by Toms River Water Co. v. N.J. Bd. of Pub. Util. Commr's, 158 N.J. Super. 57, 60 (App. Div. 1978).  We explained that the Board "has the power and discretion to choose any of the foregoing general approaches or any other approach which rationally determines petitioner's effective tax rate," unless it "plainly contravenes" the governing statutes.  Id. at 60-61 (citation omitted).  We further explained that the Board is not required "to utilize any particular method," as long as the method has "a rational relationship with . . . [the] determination of the actual tax liability" and the Board "articulate[s] its rationale for choosing [that] specific method of computation."  Id. at 61.

We have used the term "real" in relation to a utility's tax expenses without defining it, and most importantly, without defining it to be the result of a particular method of calculating the CTA or any other aspect of a

17

consolidated group's taxes. The CTA is the Board's determination of the utility's "actual" taxes because it incorporates the finding of the utility's proper share of the group's tax saving. The length of the look-back period, and the inclusion or exclusion of certain classes of assets, are elements of identifying the income and expenses to be used in calculating the CTA.

By contrast, any allocation of the CTA would be made after the Board determined the CTA. Allocating to shareholders any portion of the CTA—the amount in which the Board found the utility's tax expense to be "hypothetical"—would make the ratepayers bear a hypothetical tax expense to that extent, in violation of case law precedent.

ACE and other respondents, although not the Board, rely on New Jersey Power & Light, 9 N.J. at 528-29, for its acceptance of an equal division of the consolidated group tax saving between the ratepayers and the shareholders. As discussed above, the Court found the failure to allocate the entire tax saving to the ratepayers to be reversible error, but it declined to reverse or modify the rate base order "in this case," as opposed to all cases on principle, due to the overall fairness of the utility's rate of return, the "apparent satisfaction of the public with the existing rates," and "the rising tax level now being experienced." Ibid. The dispensation that the Court granted in New Jersey

Power & Light has not been cited since, even twenty-five years later when we decided Lambertville and Toms River and required the agency to act on the basis of a utility's "real" or "effective" tax expense.

The Board argues that the allocation "reflects the contributions of both the taxable gain and taxable loss members" of a consolidated group to the realization of the tax saving, but that implies that the determination of each member's proper share of the tax saving had not already occurred during the calculation of the CTA. For all its references to the allocation as a "sharing mechanism" for fair distribution of the CTA after its calculation, the Board fails to confront the case law, which holds the fair distribution of the CTA is for the ratepayers to receive all of it.

The Board continues to state the purpose of allocating the CTA as giving ratepayers a portion of the CTA while also encouraging utility investment. While the Board has the discretion in rate base cases to "balance . . . competing consumer and utility interests," In re Application of Rockland Elec. Co., 231 N.J. Super. 478, 495 (App. Div. 1989), the record does not indicate that the allocation was the Board's only vehicle for encouraging investment. It is conceivable that reducing the look-back period to five years and excluding transmission assets would not substantially further that goal without the

19

allocation, but the Board did not state representations or findings to that effect. In any event, the CTA is just one element in determining a utility's rates, and there is no evidence in the record that the Board would be unable to use other aspects of a rate base proceeding to determine just and reasonable rates that encourage investment notwithstanding the ratepayers' receipt of the full CTA.

Based on our review, the allocation of a portion of the CTA to shareholders requires reversal. All of the remaining arguments raised by Rate Counsel and other parties were found to lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Reversed and remanded for the Board to determine an appropriate course of action consistent with the court's opinion. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3621-18